**FEDERAL CARTRIDGE CORPORATION.**
**v. UNITED STATES.**
No. 47675.

Court of Claims.
May 3, 1948.

The facts necessary to a decision of this case are set out in the opinion; they are set out more in detail in the following

### Special Findings of Fact

1. The plaintiff is, and during all the times mentioned in these findings was, a corporation organized and existing under

and by virtue of the laws of the State of Minnesota, having its principal office in Minneapolis, Minnesota.

2. Beginning in the year 1922, and at all times mentioned in these findings, plaintiff has owned and operated, and still owns and operates a plant at Anoka, Minnesota, for the manufacture of sporting-type ammunition, consisting of shotgun shells and .22 calibre and air-rifle ammunition. The manufacture of shotgun shells and .22 calibre and air-rifle ammunition has always constituted and still constitutes plaintiff's normal peacetime operation, and plaintiff has at no time engaged in the manufacture of any other product or in any other business except in connection with the performance of its contract with the United States of America hereinafter described, except that during the last war detonators and smoke bombs were manufactured at its Anoka plant.

3. On July 14, 1941, plaintiff entered into a certain contract in writing with the United States, known and described and hereinafter referred to as Prime Contract W–ORD–527. Thereafter, from time to time, certain contracts and change orders, supplemental to said Prime Contract W–ORD–527, were entered into between plaintiff and the United States, amending the terms and conditions of the prime contract. The prime contract, as supplemented and amended, provided for the construction of a plant located at New Brighton, Minnesota, some thirteen miles distant from plaintiff's plant at Anoka, the furnishing of management services in connection therewith, the procuring of production equipment, training of personnel, and the operation of the plant for the manufacture of small-arms ammunition, consisting of .30 and .50 calibre cartridges. This plant is designated in the prime contract, and is hereinafter referred to as the "Twin Cities Ordnance Plant." The land, buildings, machinery and equipment comprising the same were at all times and still are owned by the United States. The operations at the Twin Cities Ordnance Plant were conducted independently and separately from and had no connection with the operations at Anoka. There was no exchange of materials between the two plants, nor exchange of workmen or personnel, and the two plants maintained sep-

arate hiring offices, separate pay rolls, separate cost records and separate bank accounts. Supplement No. 43, dated September 23, 1946, consisted of a settlement agreement pursuant to notice of termination for the convenience of the Government issued August 14, 1945. In said termination contract No. 43, plaintiff duly reserved the right to make the claim involved in this action.

4. Pursuant to the terms of said prime contract and change orders amending and supplementing the same, defendant advanced funds to plaintiff, which were deposited in a special bank account or accounts separate from plaintiff's general funds, known as the "advance fund," and maintained as a revolving fund for the carrying out of the purposes of the contract. Expenses incident to the operation at the Twin Cities Ordnance Plant were paid by plaintiff out of this advance fund and plaintiff then in each instance requested reimbursement of the advance fund from the United States by presentation of vouchers for approval to the Contracting Officer or his representative in charge of operations, and if the vouchers were approved, reimbursement was made by the finance officer.

5. The contract provided for compensation to plaintiff by the payment of a fixed fee for its services in connection with the construction, management and operation of the Twin Cities Ordnance Plant; and to reimburse plaintiff for all costs and expenditures in connection with such construction and operations.

The contract provided, in part, as follows:

"Article V–A—Reimbursement for Contractor's Expenditures and Payment of Predetermined Fixed Amounts

"(1) The Contractor shall be reimbursed in the manner hereinafter described for such of its actual expenditures in the performance of the work under this contract, and, with respect to Section 3d (2) hereof, paid the predetermined fixed amounts as may be approved or ratified by the Contracting Officer, and as are included in but not limited to the following items:

"a. All labor, materials, tools, machinery, equipment, facilities, supplies, utilities,

services and all expenses in connection with repairs and maintenance necessary for either temporary or permanent use for the benefit of the work, including the training of operating personnel. * * *

"e. Expenses of procuring labor and expediting the production and transportation of material, supplies, and equipment. * * *

"i. The cost of losses or expenses not compensated by insurance or otherwise (including settlements made with the written consent of the Contracting Officer) actually sustained by the Contractor in connection with the work and found and certified by the Contracting Officer to be just and reasonable, unless reimbursement therefor is expressly prohibited; provided that such reimbursement shall not include any amount for which the contractor would have been indemnified or compensated by insurance except for failure of the Contractor to procure or maintain bonds or insurance in accordance with the requirements of the Contracting Officer. * * *

"k. Payments made by the Contractor under the Social Security Act (employer's contribution) and any disbursements required by law which the Contractor may be required on account of this contract to pay on or for any plant, equipment, process, organization, materials, supplies, or personnel; and, if approved in writing by the Contracting Officer in advance, permit and license fees and royalties on patents used including those owned by the Contractor. * * *

"q. Disbursements incident to payment of pay rolls, including but not limited to, the cost of disbursing cash, necessary guards, cashiers and paymaster.* * *

"r. Such other items as should, in the opinion of the Contracting Officer, be included in the cost of the work. When such item is allowed by the Contracting Officer, it shall be specifically certified as being allowed under this paragraph. * * *

"5. No salaries of the Contractor's executive officers or partners, no part of the expense incurred in conducting the Contractor's main office or regularly established branch offices, and no overhead expenses of any kind, except as specifically authorized in Section 1 of this Article, shall be included

in the cost of the work under this contract; nor shall any interest on capital employed or on borrowed money be included in the cost of the work. * * *

### "Article V–B—Payments Reimbursement for Cost

"1. a. The Government will currently reimburse the Contractor for expenditures made in accordance with Article V–A of this Title V, upon certification and delivery to and verification by the Contracting Officer of the original signed pay rolls for labor, the original receipted invoices for materials, equipment, etc., or other original papers satisfactory to the Contracting Officer. Reimbursement will be made as promptly as possible, generally weekly, but may be made at more frequent intervals if the conditions so warrant. * * *

### "Article VII–A—Responsibility of Contractor

"It is the understanding of the parties hereto, and the intention of this contract, that all work under Titles I, II, III, and IV of this contract is to be performed at the expense of the Government and that the Government shall hold the Contractor harmless against any loss, expense (including expense of litigation), or damage (including liability to third persons because of death, bodily injury or property injury or destruction or otherwise) of any kind whatsoever arising out off or in connection with the performance of the work under this contract, except to the extent that such loss, expense, damage or liability is due to the personal failure on the part of the corporate officers of the Contractor, or of other representatives of the Contractor having supervision or direction of the operation of the Plant as a whole, to exercise good faith or that degree of care which they normally exercise in the conduct of the Contractor's business.

### "Article VII–G—Special Requirements

"The Contractor hereby agrees that it will: * * *

"2. Procure all necessary permits and licenses; obey and abide by all applicable laws, regulations and ordinances and other rules of the United States of America, of the state, territory, or subdivision thereof

wherein the work is done, or of any other duly constituted public authority. * * *

"Article VII–N—Disputes (As Amended by Supp. 10)

"Except as otherwise specifically provided in this Contract, all disputes concerning questions of fact which may arise under this Contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the Contractor at his address shown herein. Within 30 days from said mailing the Contractor may appeal in writing to the Secretary of War, whose written decision or that of his designated representative or representatives thereon shall be final and conclusive upon the parties hereto. The Secretary of War may, in his discretion, designate an individual, or individuals, other than the Contracting Officer, or a board as his authorized representative to determine appeals under this Article. * * * Any sum or sums allowed to the Contractor under the provisions of this Article shall be paid by the United States as part of the cost of the articles or work herein contracted for and shall be deemed to be within the contemplation of this Contract."

6. Plaintiff in every respect fully and completely performed said prime contract, as amended and supplemented, in accordance with the terms and conditions thereof until its termination.

7. The contracting officer was represented by Captain Valaid A. Lufi for the period March 24, 1943 to October 31, 1943, inclusive; Lieutenant Colonel E. E. Gialdini from November 1, 1943 to December 31, 1945; and Colonel Merle R. Williams from January 1, 1946 to May 15, 1946, with powers of the general contracting officer for the full contract.

8. Under the Minnesota Employment and Security Law of 1936, M.S.A. §§ 268.03–268.24, plaintiff was required to contribute to the Division of Employment and Security of the State of Minnesota an amount computed upon its taxable pay rolls (including wages at less than $3,000 per annum). The annual rate of assessment was determined by the Division of Employment and Security, from unemployment benefits paid to former employes of each employer, subject to the provisions of the law, which determination was established upon three years of the employer's experience. The rate of assessment so determined was fixed upon the basis of the employer's "experience ratio." An employer was assessed the maximum rate of 2.75 percent on its taxable pay roll until it had established an "experience ratio" after three years of employment. Plaintiff's experience ratio carried an assessment of three-fourths of one percent for the calendar year 1942.

During all times after a three-year employment period, the contribution rates varied from a minimum of 0.50 percent of the employer's pay roll (in the lowest category) to a maximum of 2.75 percent of employer's pay roll (in the highest category). Employers with no experience ratio automatically fall into the highest category. Plaintiff had acquired a very low experience ratio in connection with the operations of its Anoka Plant, and since, under the Unemployment and Security Law, plaintiff's operations at Anoka and at the Twin Cities Ordnance Plant constituted operations carried on by plaintiff as one employing unit, both operations were given the benefit of this low experience ratio.

9. Prior to 1943, plaintiff separately reported the taxable pay rolls to the State Division of Employment and Security. However, the State of Minnesota considered them as a single entity and combined them for the purposes of the security law contributions. The state employment and security assessment was taxed in like manner upon plaintiff's pay roll at its own plant and its pay roll for the Government-owned Twin Cities Ordnance Plant, based upon plaintiff's "experience ratio" for each year. Plaintiff paid its assessment upon its pay roll at the Anoka plant from its own funds, and drew upon the Government "advance fund" for the payment of the assessment upon the pay roll at the Twin Cities Ordnance Plant.

No claim is involved in this action on these assessments.

10. In 1943, Laws Minn.1943, c. 650, the Minnesota Employment and Security Law was amended to include a special war risk

assessment. It provided that those employers who started operations and became subject to the security law subsequent to 1940 would become subject to the special assessment amendment beginning January 1, 1942, whereas those employers who operated during 1940 or earlier and had paid the normal security taxes during 1940, would become subject to the special assessment beginning January 1, 1943, and only to the extent of any excess over 200 percent of their 1940 taxable pay rolls. This amendment reads as follows: "Any employer who subsequent to December 31, 1940, has become or becomes subject to Chapter 23AA, Mason's Minnesota Statutes, 1940 Supplement, as amended by Laws 1941, Chapter 554, and as amended by this act, whose total current pay roll, as defined in this subsection, for any calendar quarter within the period beginning January 1, 1942, and ending June 30, 1945, exceeds $50,000 shall pay war risk contributions, and any other employer whose total current pay roll, as defined in this subsection, for any calendar quarter within such period exceeds $50,000, which has increased 100% or more over and above his normal pay roll for the corresponding calendar quarter in 1940, shall in addition to his normal contributions pay war risk contribution on that part of his current pay roll over and above 200% of his normal pay roll, for the first such calendar quarter or the quarter commencing January 1, 1943, whichever is later and for each calendar quarter thereafter to and including June 30, 1945." Laws Minn.1943, c. 650, § 2.

It was continued after June 30, 1945, by an amendment thereto. Laws Minn.1945, c. 376.

This special war risk assessment became applicable to any employer whose total current taxable pay roll for any calendar quarter of a year beginning January 1, 1943, exceeded $50,000 and had increased more than 100 percent over and above such corresponding taxable quarterly pay roll in 1940; the assessment being 3 percent of the excess over and above 200 percent of the 1940 quarterly taxable pay rolls. Had the Twin Cities Ordnance Plant operated as an independent employer its assessment would have become effective January 1, 1942, without any exemptions.

11. On May 4, 1943, Mr. C. C. Clark, Chief, Accounting Section of the Minnesota Division of Unemployment and Security, notified plaintiff of the war risk contribution amendment and set forth figures showing plaintiff's reported pay roll per quarter for 1940 as follows:

First calendar quarter......... $144,817.40
Second calendar quarter....... 151,915.84
Third calendar quarter ........ 170,698.34
Fourth calendar quarter....... 154,951.08

This represented plaintiff's taxable pay rolls, only at its Anoka plant, since the contract with defendant was not in existence in 1940.

Mr. Clark further stated that war risk contributions at the rate of 3 percent would be assessed against any portion of plaintiff's pay rolls which exceeded its 1940 pay rolls by 200 percent.

Plaintiff verified the correctness of its 1940 quarterly taxable pay rolls, as submitted by Mr. Clark, and prepared a memorandum May 6, 1943, which was transmitted to Captain Lufi, T. C. Dunville, defendant's field auditor, and other officials of the Government, and also to certain of plaintiff's officials who were interested in this matter. The memorandum is as follows:

"Attached is a copy of a letter dated May 4 received from the Minnesota Division of Employment and Security. It is therein stated that an additional unemployment tax at the rate of 3% will be assessed against certain employers having stated conditions of employment pay roll.

"There is also attached a computation showing what taxes would be payable under (1) the %10 of 1% rate regularly applied, and (2), the 3% War Risk Contributions.

"The question is whether or not the additional 3% War Risk Contributions should be borne entirely by New Brighton operations or if it should be prorated between New Brighton and Anoka operations. Reference to the computation will show that if New Brighton operations were not in the pay-roll picture that there would be no 3% War Risk Contributions to be paid by them.

"It is requested that each of you express an opinion in writing as to the contributions to be made by each unit, giving your reasons therefor."

12. By memorandum of May 24, 1943, defendant's field auditor, T. C. Dunville, advised plaintiff that the war-risk tax assessment should be prorated against its gross pay roll at the Anoka plant and its pay roll for the Twin Cities Ordnance Plant. The effect of such pro rata assessments would be to likewise apply pro rata the exemptions authorized to plaintiff at 200 percent of its 1940 quarterly pay rolls.

13. Plaintiff, in a memorandum under date of September 10, 1943, addressed to Captain Lufi, protested the apportionment of the war risk assessment, setting forth in detail the amount of the Anoka plant pay roll, also showing the 200 percent of said amount and detailed analyses of the pay rolls and application thereto of the war risk insurance.

Under date of October 5, 1943, Mr. T. C. Dunville, U. S. Field Auditor, Ordnance Department, advised plaintiff, in writing:

"It is the opinion of this office that your company is entitled to the full amount of the tax under that part of Article V–a, Paragraph 1–k of Contract W–ORD–527 which allows 'Payments made by the Contractor under the Social Security Act [42 U.S.C.A. § 301 et seq.] (employer's contribution) and any disbursements required by law which the Contractor may be required, on account of this contract to pay on or for any plant, equipment, process, or organization, materials, supplies or personnel.'

"Mr. McKennan has, accordingly, been requested to submit, on a Form 1034, your claim for the amount of the tax withheld making specific reference thereon to the above mentioned Contract W–ORD–527 provision."

Plaintiff, on vouchers regularly approved by defendant's representatives, thereafter paid the war risk tax from the Government advance fund. The war risk tax amounted to $2,661,224.62 for the entire taxable period on quarterly pay rolls from January 1943, through September 1945. In no quarterly period did plaintiff's pay roll at its Anoka plant exceed the 200 percent exemption allowed on its corresponding 1940 quarterly taxable pay rolls. On the contrary, plaintiff's authorized exemptions for the entire period exceeded plaintiff's actual pay roll at its Anoka plant by $372,289.77. (See table in finding 14.)

14. In computing the war risk assessments against plaintiff the Minnesota Division of Employment and Security combined plaintiff's pay roll at its Anoka Plant with the pay roll at the Government-owned plant at New Brighton, the Twin Cities Ordnance Plant, and thereafter applied the exemptions authorized against plaintiff's 1940 quarterly pay rolls in the manner following:

| Periods by quarters | Pay rolls at Anoka plant | Pay rolls at T. C. O. P. | Combined pay rolls | Exemptions at 200 percent of 1940 pay rolls | Net amount taxable at 3 percent |
|---|---|---|---|---|---|
| *1943* | | | | | |
| 1st ........ | $284,205.60 | $12,061,662.29 | $12,345,867.89 | $289,634.80 | $12,056,233.09 |
| 2nd ...... | 303,784.72 | 14,204,176.71 | 14,507,961.43 | 303,831.68 | 14,204,129.75 |
| 3rd ...... | 265,364.40 | 13,765,201.35 | 14,030,565.75 | 341,396.68 | 13,689,169.07 |
| 4th ...... | 243,857.64 | 8,431,805.66 | 8,675,663.30 | 309,902.16 | 8,365,761.14 |
| *1944* | | | | | |
| 1st ........ | 280,920.45 | 8,134,230.63 | 8,415,151.08 | 289,634.80 | 8,125,516.28 |
| 2nd ...... | 295,253.03 | 5,843,390.08 | 6,138,643.11 | 303,831.68 | 5,834,811.43 |
| 3rd ...... | 292,104.48 | 4,929,648.73 | 5,221,753.21 | 341,396.68 | 4,880,356.53 |
| 4th ...... | 261,386.42 | 4,479,020.34 | 4,740,406.76 | 309,902.16 | 4,430,504.60 |
| *1945* | | | | | |
| 1st ........ | 283,950.72 | 7,357,626.66 | 7,641,577.38 | 289,634.80 | 7,351,942.58 |
| 2nd ...... | 287,974.13 | 6,361,911.47 | 6,649,885.60 | 303,831.68 | 6,346,053.92 |
| 3rd ...... | 253,302.44 | 3,511,103.42 | 3,764,405.86 | 341,396.68 | 3,423,009.18 |
| Totals .. | 3,052,104.03 | 89,079,777.34 | 92,131,881.37 | 3,424,393.80 | 88,707,487.57 |
| Ratios ... | 3.3% | 96.7% | 100% | ............ | ............ |

386

15. Pursuant to authority from the contracting officer and advice from the field auditor October 5, 1943, plaintiff, on October 18, 1943, paid the war risk tax on pay rolls for the first two quarters of 1943, and charged the same to the Government advance fund. Similar payments were made as reflected in the table set forth below.

In October 1944, the Comptroller General excepted to the full charges of the war risk tax against Government funds, and suspended the Government disbursing officer's accounts by notices on dates indicated in the following table, and for the amounts apportioned to plaintiff's pay rolls at its Anoka plant, as follows:

| November 13, 1944 | $40,208.00 |
| April 20, 1945 | 23,937.80 |
| June 15, 1945 | 8,195.65 |
| September 14, 1945 | 8,304.32 |
| November 30, 1945 | 6,852.65 |
| Total | 87,498.42 |

Plaintiff submitted a reclaim voucher for the amount of $40,208.00, first deduction above, which was forwarded to the General Accounting Office for direct settlement. By his decision B–51726, October 25, 1945, the Comptroller General denied this voucher, and plaintiff was duly notified of this decision.

| Quarterly periods | War risk taxes paid and charged to the Advance Fund | | Reallocations by the General Accounting Office, and notices of suspensions to Disbursing Officer | | |
| --- | --- | --- | --- | --- | --- |
| | Date | Amounts | Date | Anoka Plant pay rolls | T. C. O. P. pay rolls |
| *1943* | | | | | |
| 1st | 10–18–43 | $361,686.99 | 10– 9–44 | $17,248.71 | $770,562.17 |
| 2nd | 10–18–43 | 426,123.89 | | | |
| 3rd | 3– 9–44 | 410,675.07 | 10– 9–44 | 7,767.34 | 402,907.73 |
| 4th | 2– 1–44 | 250,972.83 | 10– 9–44 | 7,054.40 | 243,918.43 |
| *1944* | | | | | |
| 1st | 4–28–44 | 243,765.49 | 10– 7–44 | 8,137.55 | 235,627.94 |
| 2nd | 1–24–45 | 175,044.34 | 3–15–45 | 16,608.85 | 304,846.19 |
| 3rd | 1–24–45 | 146,410.70 | | | |
| 4th | 1–29–45 | 132,915.14 | 3–15–45 | 7,328.95 | 125,586.19 |
| *1945* | | | | | |
| 1st | 4–27–45 | 220,558.28 | 6–20–45 | 8,195.65 | 212,362.63 |
| 2nd | 7–30–45 | 190,381.62 | 9–14–45 | 8,304.32 | 182,077.30 |
| 3rd | 11– 1–45 | 102,690.27 | 12– 6–45 | 6,852.65 | 95,837.62 |
| Totals | .......... | 2,661,224.62 | .......... | 87,498.42 | 2,573,726.20 |

16. Following receipt of notices of exceptions from the Comptroller General, the Finance Officer made deductions on vouchers for amounts otherwise due plaintiff for restoring the advance fund, corresponding to the amounts against which exceptions had been entered. The amounts so deducted from sums otherwise due plaintiff were made on the dates and for amounts following:

17. On December 12, 1945, plaintiff was advised by the contracting officer to reimburse the advance fund for the sum of $87,498.42, in accordance with the Comptroller General's decision. Plaintiff did restore the said amount and fully accounted for the advance fund by refunds of unused balances upon the termination of the contract work. The contracting officer also advised plaintiff in this letter as follows:

"Inasmuch as no dispute exists between our respective offices, as to whether the Prime Contractor should receive reimbursement of the full amount of all War Risk tax payments made by him, Procurement Regulations 3, Section 318–E, 2, Rule II–3 and Article VII–N of Prime Contract W–ORD–527 are not for application in this matter and a Findings of Fact will not, therefore, be prepared by this office."

18. Plaintiff submitted an appeal on June 8, 1946, as against the decision of the Comptroller General and the order of the contracting officer directing the reimbursement and accountability for the $87,498.42 of war risk taxes paid to the state of Minnesota in pursuance of that decision.

19. On July 12, 1946, the War Department Board of Contract Appeals issued a decision upon plaintiff's claim for refund, wherein the board found that plaintiff was entitled to recover the expenditures for all war risk taxes paid. Plaintiff's claim was then transmitted to the General Accounting Office for direct settlement.

20. By certificate of settlement issued September 17, 1946, the Comptroller General denied any portion of plaintiff's claim, and plaintiff was duly notified thereof, as follows:

"Your claim in the sum of $87,498.42, representing reimbursement for war risk insurance contributions paid by you under the Minnesota Employment and Security Act in connection with services furnished the War Department at Government-owned plant for the manufacture of small arms ammunition, located at Anoka, [New Brighton] Minnesota, pursuant to the terms of cost-plus-a-fixed-fee contract No. W–ORD–527, dated July 14, 1941, has been carefully examined and it is found that no part thereof may be allowed for the reasons hereinafter stated.

"The record indicates that the war risk contribution as levied by the Minnesota statute is placed on the total over-all current pay roll of the contractor and not on any one or more specific pay rolls to the exclusion of others. Further, the statute makes no provision for the apportionment of the contribution to any specific payroll.

"While it may be that, under the provisions of the Minnesota statute, you would not have been subject to the additional war risk contribution if you had not entered into the instant cost-plus-a-fixed-fee contract, the fact nevertheless remains that you did enter into such contract, and consequently, your claim for reimbursement must be considered in the light of such fact rather than on the basis of what the situation might have been but for the execution of said contract.

"Careful consideration has been given to the various contentions presented by you and this office is constrained to hold that they do not afford any proper basis for the conclusion that the entire amount of the war risk contributions required to be paid by you, is reimbursable as an item of cost to the instant cost-plus-a-fixed-fee contract. See 24 Comp.Gen. 619.

"I therefore certify that no balance is found due you from the United States."

Loring M. Staples, of Minneapolis, Minn. (Faegre & Benson, of Minneapolis, Minn., on the brief), for plaintiff.

Paris T. Houston, of Washington, D. C., and H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and WHITAKER, HOWELL, MADDEN and LITTLETON, Judges.

WHITAKER, Judge.

Plaintiff sues for Social Security taxes which it alleges it was required to pay on account of its performance of a cost-plus-a-fixed-fee contract which it entered into with the defendant for the operation of the Twin Cities Ordnance Plant at New Brighton, Minnesota.

Prior to entering into this contract with defendant on July 14, 1941, plaintiff had been operating at Anoka, Minnesota, about 13 miles from New Brighton, a plant for the manufacture of sporting-type ammunition, shotgun shells, .22 calibre rifle ammunition, and air-rifle ammunition. Its annual pay roll at this plant ran in the neighborhood of $600,000. On this it was subject to a Social Security tax levied by the State of Minnesota of ¾ of 1 percent. The Minne-

388

sota tax was graduated from 0.5 of 1 percent to 2.75 percent, depending upon the amount payable from the Minnesota unemployment fund on account of unemployment in an individual plant. In plaintiff's plant there was but little unemployment, and consequently the tax levied upon it was comparatively small.

At the Twin Cities Ordnance Plant there was manufactured .30 calibre and .50 calibre cartridges. These were cartridges used by the armed forces. It was a war plant. Its operations ceased upon termination of the war.

In 1943 the State of Minnesota amended its Employment and Security law to provide for unemployment which would be brought about by the termination of the war. Insofar as plaintiff's situation is concerned, it provided for a levy of 3 percent on that part of an employer's pay roll which exceeded 200 per cent of its 1940 pay roll. Plaintiff's pay roll at its Anoka plant during the war years was much less than 200 percent of its 1940 pay roll; but, its quarterly pay rolls at the Twin Cities Ordnance Plant ran from $3,511,103.42 to $14,204,176.71 as against the largest 1940 quarterly pay roll of $170,698.34. Hence, plaintiff became liable for the 3 percent tax. It became liable for it only because of its operations at the Twin Cities Ordnance Plant.

The question presented is whether or not it is entitled to charge as a cost of performance the entire 3 percent levied on its combined Anoka and New Brighton pay rolls, or whether or not this 3 percent tax should be apportioned between the New Brighton Plant and the Anoka Plant in accordance with the pay rolls at each, and only a portion charged as a cost of performance under the cost-plus-a-fixed-fee contract. The Comptroller General took the latter view and plaintiff sues on the theory that the entire 3 percent tax was an expense attributable to its operation of the Twin Cities Ordnance Plant, and that under its contract with the Government it is entitled to reimbursement therefor.

The contracting officer agreed with plaintiff, and reimbursed it for the entire amount it paid on account of this 3 percent tax; but the Comptroller General overruled the contracting officer, and the contracting officer in turn required plaintiff to make reimbursement for the amount of this tax attributable to the Anoka pay roll. Notwithstanding this decision of the Comptroller General, the Board of Contract Appeals in the War Department also held that the plaintiff was entitled to be paid the entire 3 percent tax, but the Comptroller General adhered to his previous decision and plaintiff has not been paid the amount of this tax attributable to the pay roll at the Anoka plant.

Whether or not this is right is, of course, to be determined by the provisions of the contract.

Article V–A of the contract provided in part: "(1) The Contractor shall be reimbursed in the manner hereinafter described for such of its actual expenditures in the performance of the work under this contract, and * * * paid the predetermined fixed amounts as may be approved or ratified by the Contracting Officer, and as are included in but not limited to the following items: * * *" Paragraph a provided for reimbursement of labor, materials, tools, machinery, equipment, etc., for "either temporary or permanent use for the benefit of the work." Paragraph e provided for expenses of procuring labor and transportation of material, supplies, etc. Paragraph i provided for reimbursement of: "The cost of losses or expenses not compensated by insurance or otherwise * * * actually sustained by the Contractor in connection with the work and found and certified by the Contracting Officer to be just and reasonable, unless reimbursement therefor is expressly prohibited; * * *" and paragraph k provided for reimbursement of: "Payments made by the Contractor under the Social Security Act (employer's contribution) and any disbursements required by law which the Contractor may be required on account of this contract to pay on or for any plant, equipment, process, organization, materials, supplies, or personnel * * *"

In addition to this article of the contract, article VII–A contained this broad language: "It is the understanding of the parties hereto, and the intention of this

contract, that all work under Titles I, II, III, and IV of this contract is to be performed at the expense of the Government and that the Government shall hold the Contractor harmless against any loss, expense (including expense of litigation), or damage (including liability to third persons because of death, bodily injury or property injury or destruction or otherwise) of any kind whatsoever arising out of or in connection with the performance of the work under this contract, except to the extent that such loss, expense, damage or liability is due to the personal failure on the part of the corporate officers of the Contractor * * * to exercise good faith or that degree of care which they normally exercise in the conduct of the Contractor's business."

■ It is thus seen that it was, in short, the intention of the parties that the contractor should be reimbursed for every sort of expense or liability incurred as a result of the carrying out of the contract, with the sole exception of such expenses as were incurred as the result of the failure of plaintiff's officers to exercise good faith or that degree of care which they exercised in the carrying out of their own business.

■ Plaintiff was merely running the plant for the Government; the Government was paying all the expenses and paying the plaintiff a fee for running the plant for it.

It is admitted that except for the operation of this Twin Cities Ordnance Plant, plaintiff would not have been liable for this extra 3 percent unemployment tax. The payment of the tax, therefore, was an expense incident to the carrying out of this contract, and under its plain terms plaintiff is to be reimbursed therefor in full.

There is more than one provision of the contract that requires this. It is required under article VII-A, in which the Government agrees that it will "hold the Contrac-

tor harmless against any loss, expense, * * * or damage * * * of any kind whatsoever arising out of or in connection with the performance of the work under this contract."

It is allowable under paragraph i of article V-A, which reads in part: "The cost of losses or expenses not compensated by insurance or otherwise * * * actually sustained by the Contractor in connection with the work and found and certified by the Contracting Officer to be just and reasonable, unless reimbursement therefor is expressly prohibited; * * *" Nowhere in the contract do we find any prohibition against the payment of this expense, and the contracting officer has agreed that it was a just and reasonable expense because he authorized its payment.

The reimbursement of it is explicitly authorized under paragraph k of article V-A which reads: "Payments made by the Contractor under the Social Security Act (employer's contribution) and any disbursements required by law which the Contractor may be required on account of this contract to pay on or for any plant, equipment, process, organization, materials, supplies, or personnel; * * *" This was a disbursement required by law which the contractor was required to pay on account of the personnel employed in carrying out the contract.

We do not think the contract admits of any other interpretation. The plaintiff so construed it and the Government's own contracting officer so construed it.

Judgment will be entered in favor of the plaintiff for $87,498.42.

JONES, Chief Justice, and HOWELL, MADDEN and LITTLETON, Judges, concur.