**L. B. SMITH, Inc., a Corporation,**
v.
**The UNITED STATES.**

**The WOLF COMPANY, a Corporation,**
v.
**The UNITED STATES.**
**Nos. 50439, 50440.**

United States Court of Claims.
Oct. 2, 1956.

Robert V. Smith, Washington, D. C., for plaintiffs. Robert P. Smith, Joseph W. Kiernan, and Smith, Ristig & Smith, Washington, D. C., were on the briefs.

John F. Wolf, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Gen., for defendant. Herbert M. Canter, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

The plaintiffs, L. B. Smith, Inc., and The Wolf Company, a wholly owned subsidiary of the Smith Corporation, are Pennsylvania corporations engaged, among other things, in the acquisition and resale of supplies and equipment from war contractors' termination inventories. They brought this suit under the Fifth Amendment to the Constitution alleging that property was taken from them by the United States without due process of law and without the payment of just compensation.

The property alleged to have been taken was 18 fork lift trucks which were originally part of the termination inventory under a contract between Aetna Standard Engineering Company and the United States. It is plaintiffs' position that on December 6, 1945, they had consummated with Aetna contracts of sale under which plaintiffs on that day acquired title to the 18 trucks, and that subsequently, defendant took the trucks and turned them over to the Reconstruction Finance Corporation (hereinafter sometimes referred to as the R. F. C.) for the use of the Reserve Moving & Erecting Company without making payment therefor to the plaintiffs. It is defendant's position that when it took the trucks in question, title thereto was not in the plaintiffs under the facts and circumstances of record in this case. This is the issue.

On August 14, 1945, the Government terminated a contract between itself and the Aetna Standard Engineering Company, an Ohio corporation engaged in the production of war materials for the Government under contracts with various governmental agencies. The terminated contract in question was for the manufacture of model 19 HT Ross fork lift trucks, such manufacture being in accordance with a license agreement entered into between the Ross Carrier Company of Benton Harbor, Michigan, and the Aetna Company.

The contract between Aetna and the Government provided in the usual form in part:

"Article 12. Termination at the Option of the Government. * * * (b) After receipt of a Notice of Termination and except as otherwise directed by the contracting officer, the contractor shall * * * (6) transfer title and deliver to the Government in the manner, to the extent and at the times directed by the contracting officer (i) the fabricated or unfabricated parts, work in process, completed work, supplies and other material produced as a part of, or acquired in respect of the performance of, the work terminated in the Notice of Termination, and (ii) the plans, drawings, information and other property which, if the contract had been completed, would be required to be furnished to the Government; *(7) use his best efforts to sell in the manner, to the extent, at the time, and at the price or prices directed or authorized by the contracting officer, any property of the types referred to in subdivision (6) of this paragraph provided, * * "* (Emphasis supplied.)

Procedures for the termination of such war contracts, including the disposition of termination inventories, are governed by the Contract Settlement Act of 1944, 41 U.S.C.A. § 101, the Surplus Property Act of 1944, 50 U.S.C.A.Appendix, § 1611, and the Joint Termination Regulations issued November 1, 1944, as amended.

Pursuant to § 12(b) of the Contract Settlement Act, supra, Aetna filed with

the Army Quartermaster Corps, the contracting agency, a Termination Inventory Schedule, which schedule included, among other things, approximately 100 substantially completed fork lift trucks all but 22 of which were subsequently disposed of by declaring them to various Government agencies by the last week of November, 1945. The Termination Inventory Schedule tendered title to the Government as of the date of its submission but, as to the remaining 22 trucks, title was not accepted by the Government at any time prior to December 6, 1945.

A Mr. Carroll was designated by Aetna as Termination Officer and was charged with the task of liquidating the inventory. The United States Joint Termination Regulations (hereinafter sometimes referred to as JTR) § 442(1) empowered him as the duly authorized representative of the war contractor, Aetna, to sell any of the termination inventory at cost, without the approval of the contracting officer of the Government. While the contracting officer could at any time revoke or restrict the contractor's authority to make sales, JTR § 432.4, there is no proof in the record that this was done at any time with respect to the 18 trucks in question. Sales at less than inventory cost required the prior approval of the contracting officer. It is easily understandable why the United States would desire that contractors dispose of their large inventories.

Efforts by Aetna after termination to dispose of the remaining 22 trucks were unsuccessful and it was decided by the contracting officer that they should be advertised in order to invite bids for their sale. The advertisements, appearing in selected newspapers, on November 16, and November 19, 1945, stated in part:

"Sale of Termination Inventory

* * * * * *

"22 Ross Fork Lift Trucks Model 19 HT

* * * * * *

"These trucks are complete ready for use with following exceptions:

"Painted Prime Coat only, Tool Kit, 2 Lifting Forks, Carriage Rack, Lamp Guards

"All parts necessary to complete trucks are available in Termination Inventory.

"Sealed bids in duplicate for all or part of above trucks will be accepted by AETNA-STANDARD ENGINEERING CO., Youngstown, Ohio, until noon Nov. 26, 1945. Bids should be marked on outside of mailing envelope sealed bid dept.

"The right is reserved to reject any and all bids.

"Material will be sold FOB Plant location as is.

"Prospective bidders may inspect material at the AETNA-STANDARD ENGINEERING Co., Ellwood City, Penna., between hours of 9:00 A. M. and 4:00 P. M. Nov. 17 through 23. For further details consult Lt. H. H. Melcher at Aetna-Standard Engineering Co.

"All sales shall be made in accordance with Joint Termination Regulations."

The call for bids was unsuccessful in that the offers were for less than inventory cost, or, in some cases, for no more than scrap value. Four of the trucks, however, were subsequently sold to the Koppers Company by December 1, 1945, for $3,500[1] each, the sale being negotiated by H. G. Coffey, vice president of Aetna though the purchase orders were processed by Mr. Carroll, the Termination Officer, as was the custom and proper procedure.

Mr. Smith, president of both plaintiffs, after learning of the Government's advertisement, advised Aetna, through Termination Officer Carroll, on November 28, 1945, that he wanted to buy all of the trucks and, after inspecting them, offered Aetna $2,260 each which was ap-

---

1. This price was slightly more than cost which was $3,264.04 per truck.

proximately $1,000 below cost. The contracting officer of the Army Quartermaster Corps would not approve the acceptance of this below-cost offer whereupon Mr. Smith, in the name of L. B. Smith, Inc., placed on December 1, 1945, a definite order by telephone for 10 of the 18 trucks at inventory cost of $3,264.04 each, but requested that Carroll hold up processing the order until further instructions as he wanted time to negotiate with the contracting officer of the United States for all 18 trucks at less than inventory cost. Carroll accepted the order but agreed to withhold formal processing. Pursuant to this telephone understanding, Smith mailed his written order for the trucks dated December 1, 1945, which was received by Aetna on December 3, 1945. At the same time the order was placed for the trucks, Smith made a separate agreement with Carroll to completely assemble the trucks for not more than $200 per truck. Completion involved little more than putting on the forks, painting them and various other very minor items. These transactions were not made known to the contracting officer or his representatives at the plant, Lt. Melcher and his assistant Lt. Chosy. On December 3, 1945, Smith telegraphed a firm offer to the attention of Lt. Chosy for the entire 18 trucks for approximately $2,550 per truck which order was subsequently rejected by Chosy on December 5, 1945. On the morning of December 6, 1945, Smith notified Carroll to go ahead with his orders of December 1, 1945, for the ten trucks at inventory cost, and the separate order for their completion, and at the same time he placed an order for the remaining eight trucks for the Wolf Company at the inventory cost. A separate verbal order for the completion of these eight trucks at a cost not to exceed $200 per truck was also placed at that time. Written acknowledgments were immediately issued by Aetna and processing was commenced. On December 6, the sales were listed on the daily memorandum of sales by Aetna which was transmitted to Lt. Melcher and the contracting officer. This memorandum also included the sales of the aforementioned four trucks to the Koppers Company.

As far back as early November, 1945, the Reconstruction Finance Corporation indicated an interest in the trucks but met with some difficulty in getting proper authorization from R. F. C. headquarters for probable acquisition until December 5, 1945, when Lt. Melcher was advised by telephone by a representative of the Reserve Moving & Erecting Company, which had a storage contract with the R. F. C. at one of the latter's nearby depots, that authorization for declaration of the 18 trucks to the R. F. C. for the use of the Reserve Moving & Erecting Company had come through. An R. F. C. request number was given to Melcher at that time for forwarding to the Jeffersonville Quartermaster Depot to have the declaration of the trucks to the R. F. C. effectuated. The next day, December 6, after an inspection of the trucks by representatives of the R. F. C. and the Reserve Moving & Erecting Company, and after office hours, an agreement was reached between those representatives and the vice president of Aetna, Mr. Coffey, for the completion of the trucks at $50 each. It seems obvious that the trucks had already been sold at that time.

Lt. Melcher notified his superiors of this transaction on December 7, 1945, and also under that date received from an R. F. C. warehousing official a letter confirming the arrangements of December 6, 1945, this letter stating in part:

"Confirming arrangements made with you by a representative of this office on 6 December 1945, it is understood that you will declare surplus to RFC * * * 18 Ross Fork Lift Trucks * * * presently located at Ellwood City, Pa. plant of Aetna Standard Engineering Co."

The official declaration was made on December 11, 1945, and sent to Aetna with a transmittal letter dated December 21, 1945, and received by Aetna on December 26. While Mr. Carroll had knowledge of the previous interest of the R. F. C. in the trucks, he was not informed in

any way of the happenings of December 5 and 6 between Lt. Melcher, the R. F. C. and the Reserve Moving & Erecting Company. All the trucks were subsequently picked up by or delivered to the R. F. C. —three being picked up by them on December 20, 1945, and the remaining 15 being received by them on January 2, 1946.

Plaintiff, L. B. Smith, Inc., previously sued Aetna for breach of contract and was denied recovery by the Ohio courts their decision stating that while the Quartermaster Corps ordered the delivery of the trucks to the R. F. C. *after* a contract was entered into by the plaintiff and Aetna, the trucks had remained part of Aetna's terminal inventory until actually delivered to the purchaser, and that until then they were subject to the paramount right of the Government to appropriate them. L. B. Smith, Inc., v. Aetna Standard Engineering Co., 86 Ohio App. 418, 92 N.E.2d 818, appeal dismissed 152 Ohio St. 452, 89 N.E.2d 476. This decision is difficult to understand but it was apparently based on the Contract Settlement Act, supra, and the Joint Termination Regulations which provide that the contracting officer may (under certain circumstances) require any item of termination inventory to be transferred to the Government.

Aetna, as defendant in that case, admitted in its answer that it had accepted and acknowledged the order of the Smith company on December 6, 1945, but pleaded in avoidance of any contract liability that the contract was subject to the authority of the United States Government to dispose of the inventory. It was plaintiff's position, rejected by the Ohio courts, that when the contract between Aetna and it was executed title passed to the plaintiff and, therefore, the trucks were not part of Aetna's termination inventory when Aetna, in compliance with Government orders, delivered the trucks to the R. F. C.

Plaintiffs here contend that under valid contracts entered into between them and Aetna, title to the trucks passed to them on the morning of December 6, 1945, and the trucks were, therefore, no longer part of the termination inventory of the Aetna company subject to appropriation by the contracting agency, the Army Quartermaster Corps. We think plaintiffs are right in this. Plaintiffs also contend that the subsequent declaration and delivery to the R. F. C. constituted a deprivation of property without due process of law and without payment of just compensation in contravention of the Fifth Amendment of the Constitution of the United States. We also think they are correct in this contention. They seek to be justly compensated for the property so taken and claim that just compensation is the difference between the contract price and the retail market value of the trucks as of the day of the taking, less the cost of completing them.

The defendant, on the other hand, takes the position that title to the trucks never passed to the plaintiffs arguing that the agreements between Smith and Aetna were no more than contracts to sell trucks in a "deliverable state" rather than a contract of sale and relies on the Uniform Sales Act in force in Ohio at that time to support its contention. Defendant argues that since something had to be done to the trucks they were not in a deliverable state and, therefore, title to the goods could not pass until that thing was done to them. Defendant contends in the alternative that the contract between Aetna and the Government incorporated in it the provisions of the Contract Settlement Act of 1944, supra, reserving the rights of the Government to take possession of any termination inventory of a war contractor, and that so long as the trucks remained in possession of Aetna they were part of the termination inventory subject to those governmental rights. The defendant, in effect, argues that an authorized sale by the war contractor can pass title to the purchaser only by delivery.

Thirdly, defendant contends that the terms of the advertisement inviting bids, to wit, the trucks would be sold "F. O. B.

Plant location as is," precludes passage of title until the trucks were delivered to the carrier.

■ The controlling factor in this case is whether or not title to the trucks in question passed to the plaintiffs prior to their declaration by the contracting officer of the Quartermaster Corps to the R. F. C. If, as determined by existing principles of law relating to sales and passage of title, there was a passage of title to the plaintiffs there was a taking by the Government of property without due process and without just compensation and this is so despite the decision by the Ohio courts holding that the trucks remained part of the termination inventory of the war contractor, Aetna, until actually delivered to the purchaser. L. B. Smith, Inc. v. Aetna Standard Engineering Co., supra.

■ The terms of the Contract Settlement Act, supra, and the Joint Termination Regulations governing the disposition of termination inventories make no mention of a requirement to actually deliver to the purchaser before an item can be considered as severed from termination inventory. In fact, quite the contrary is true. Section 101 of the act declares its purpose in detail and subsection (e) states as one of the purposes "to assure the expeditious removal from the plants of prime contractors and subcontractors of termination inventory *not to be retained or sold by the contractor"*. (Emphasis supplied.)

Section 112 relating to removal and storage of termination inventory and providing for the filing of a schedule of inventory on hand after termination of the contract by the Government declares in subsection (c) that

"Within sixty days after the submission of any such statement by a war contractor, or such shorter period as may be prescribed under this chapter, or within such longer period as the war contractor may agree, the Government agency concerned (1) shall arrange, upon such terms and conditions as may be agreed, for the storage by the war contractor on his own premises or elsewhere of all such claimed termination inventory *which the war contractor does not retain or dispose of,* except * *."* (Emphasis supplied.)

Section 412.2(2) of the Joint Termination Regulations sets forth the government's policy relating to contractor inventory:[2]

"(2) The policy of the Government is to encourage war contractors to *retain for use* at the best price obtainable as large amounts as possible of all types of contractor inventory for their manufacturing, construction, maintenance, or repair purposes. The policy of the Government also *is to authorize sales by war contractors* under circumstances which will yield the best price obtainable by competitive bidding, or by negotiation in certain cases." (Emphasis supplied.)

The scope of the war contractor's authority to sell is set forth in § 442(1) of the Joint Termination Regulations:

"(1) War contractors *may retain or sell any contractor inventory at cost, without the approval of the contracting officer* or the next higher tier contractor." (Emphasis supplied.)

Thus it can be seen that it was the clearly declared policy of the Government to permit the war contractor to sell or retain any part of his termination inventory without prior approval if the sale, or retention, was at inventory cost or higher. That authorized sales are binding upon the Government and cannot be repudiated or rejected by it is explicitly provided for by the regulations as follows:

---

2. The term "contractor inventory" as distinguished from termination inventory is a much broader classification though it includes termination inventory. JTR § 411.3.

"§ 432.5 Finality of authorized dispositions.—Authorized retentions or sales of contractor inventory which meet the requirements of this Section IV, including dispositions which do not require the approval of the contracting officer, *will be accepted by the Government as final and conclusive,* in the absence of fraud." (Emphasis supplied.)

The act and the regulations do not provide that stock remains part of the termination inventory until actual delivery to the purchaser as here contended by defendant and as held by the Ohio court in its decision in the case hereinbefore cited, but on the contrary the Act and regulations consistently refer to sales by the war contractor and make it plain that he has the power to sell. Those enactments conclusively indicate that Aetna had the power and authority to sell the trucks here in question unless that power was previously revoked. The record clearly shows that this authority was neither revoked nor limited prior to the dealings between Aetna and the plaintiffs, and since the authority could not be revoked retroactively, JTR § 432.4, Aetna clearly had the authority to sell the trucks out of termination inventory at the time of the transactions between it and plaintiffs. A search of the legislative history of the Contract Settlement Act, supra, does not disclose any contrary intent on the part of Congress.

The Ohio court in holding as it did relied on section 12(e) of the Contract Settlement Act, supra, and section 432.3(2) of the Joint Termination Regulations and pointed out that the provisions of those sections permit the Government to take possession of any contractor inventory if they so desire. Those sections, however, obviously refer to that which *is* contractor or termination inventory. If there has been a sale within the purview of existing law and by virtue of that sale there has been a passage of title, as there was here, the item of inventory sold cannot logically remain part of the war contractor's termination inventory since it is owned by someone else. The Ohio court erroneously interpreted the law and regulations.

While delivery of the subject matter of a sale is in some instances necessary to pass title, it is not the only way of doing so. The words *sell* and *sales* used consistently throughout the Contract Settlement Act, supra, and the Joint Termination Regulations are legal words of art and, as such, should be given their proper legal meaning by application of existing rules.

Since the plaintiffs' place of business is located in Pennsylvania and Aetna's in Youngstown, Ohio, it must first be determined whether the laws of Ohio or Pennsylvania apply. The Federal courts follow the rule that the nature, validity and interpretation of contracts are to be governed by the law of the state where the contracts are made or are to be performed. People's Outfitting Co. v. United States, 58 F.2d 847, 74 Ct.Cl. 419, modified 2 F.Supp. 847, 77 Ct.Cl. 297; Mutual Life Ins. Co. of New York v. Cohen, 179 U.S. 262, 21 S.Ct. 106, 45 L.Ed. 181; Bank of United States v. Donnally, 8 Pet. 361, 8 L.Ed. 974; Smith v. Union Bank, 5 Pet. 518, 8 L.Ed. 212. This statement of the law is also reflected in the conflict of law rules laid down by both the Pennsylvaia and Ohio courts, Alropa Corporation v. Kirchwehm, 1941, 138 Ohio St. 30, 33 N.E.2d 655, appeal dismissed 313 U.S. 549, 61 S.Ct. 1120, 85 L.Ed. 1514; McCormick v. Taft, 1938, 61 Ohio App. 200, 22 N.E.2d 510; First Nat. Bank in Greensburg v. M. & G. Conroy, Inc., D.C.W.D.Pa.1952, 102 F.Supp. 494; Faron v. Penn Mutual Life Ins. Co., 3 Cir., 1949, 176 F.2d 290; Chicago Pneumatic Tool Co. v. Ziegler, 3 Cir., 1946, 151 F.2d 784; and is indicative of the Restatement's declarations on the problem. Restatement, Conflict of Laws §§ 328, 332, 334, 339. Since the last act in the consummation of the alleged contracts, the acceptance, was done at the Aetna company's location in Ohio, the laws of the state of Ohio must govern the rights of the parties.

At the time of the transactions in question the Uniform Sales Act was in force in Ohio and its provisions must govern in determining the intentions of the parties to the contracts and whether title to property that was the subject matter of the contracts passed to the purchaser. Ohio General Code, §§ 8398 and 8399.

The defendant in its contention that the agreements by Aetna to complete the trucks before delivery to the plaintiffs were part of the contracts to sell the trucks relies on Rules 2 and 4 of the Uniform Sales Act in support of its claim that title to the trucks did not pass to the plaintiffs on December 6, 1945, or at any other time. Ohio General Code, § 8399, Rules 2 and 4. Those rules state:

> "Rule 2. When there is a contract to sell specific goods and the seller is bound to do something to the goods, for the purpose of putting them into a deliverable state, the property does not pass until such thing be done.

> \* \* \* \* \* \*

> "Rule 4. (1) When there is a contract to sell unascertained or future goods by description, and goods of that description and in a deliverable state are unconditionally appropriated to the contract, either by the seller with the assent of the buyer, or by the buyer with the assent of the seller, the property in goods thereupon passes to the buyer. Such assent may be expressed or implied, and may be given either before or after the appropriation is made."

After taking into consideration all the negotiations and discussions relevant to the sale and completion of the trucks in question, we are of the opinion (1) that the trucks were in a deliverable state when the contract for their sale was executed; (2) that there were two contracts entered into by each of the plaintiffs with Aetna—one for the sale of the trucks and one for their assembly or completion; and, (3) that, therefore, Rules 2 and 4 above do not apply to this case.

The advertisement for the sale of the trucks which appeared in various newspapers is the beginning point of the negotiations and its contents must be considered in determining the scope of any contract or contracts eventually executed. The advertisement showed the conditions under which Aetna would be willing to sell the goods, to wit, "SALE OF TERMINATION INVENTORY \* \* \* 22 Ross Fork Lift Trucks Model 19 HT \* \* \* These trucks are complete ready for use with the following exceptions: \* \* \* Sealed bids in duplicate for all or part of *above* trucks will be accepted by \* \* \* Material will be sold FOB Plant location *as is* \* \* \*." (Emphasis supplied.) Thus, the publication notified those desiring to purchase that the trucks were not then completed or assembled and invited bids on the trucks in their partially completed state. Bids were not sought on completed trucks. Thus, the trucks in their partially completed state were the subject of all negotiations. If a contract was consummated, as we hold it was, the partially completed trucks were what was intended by the parties to be delivered. Therefore, for the purpose of these sales, the trucks were in a deliverable state even though they were only about 98% of the finished product that would have resulted had they continued on through the ordinary manufacturing stages to completion. Since the trucks were in a deliverable state and, hence, not unascertained or future goods, Rules 2 and 4 above are inapplicable.

Pursuant to the above advertisement, Mr. Smith began negotiations with Aetna, through Mr. Carroll, and subsequently made agreements with Aetna for the purchase of all 18 trucks at inventory cost price and executed purchase orders to that effect. This was enough. All discussions that Mr. Smith had with Aetna's representatives concerned the price of the trucks and did not involve negotiations for the cost of completing them, at least until a purchase price for the trucks themselves was agreed upon. The purchase price agreed to was $3,264.04 per truck and purchase orders to that

effect were issued by plaintiffs for the trucks. Aetna issued like processing orders. The Government had no further right to intervene. After this agreement on the cost of the trucks was reached, a subsequent agreement was made as to the amount it would cost plaintiffs to have the trucks completed by Aetna, it not to be in excess of $200 per truck. The plaintiffs issued *separate purchase orders* to have the work done and Aetna issued *separate processing orders*. The cost of completing the trucks was not recorded on plaintiffs' orders nor on Aetna's processing orders as the exact figure was not known. If it so desired the plaintiffs could have bought the parts from Aetna and completed the trucks themselves but they preferred to contract with Aetna to have them completed.

Inasmuch as Aetna invited bids for the trucks in their partially completed state —*as is*—and since separate orders were placed and accepted—one for the purchase of the trucks and one for their completion—the only conclusion possible is that the intent of the parties was for there to be two contracts, one for the sale of the trucks and one for their completion after such sale.

Rule 1 of the Uniform Sales Act provides that, unless a different intention appears, when there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made, and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed. Ohio General Code, § 8399, Rule 1.

When the plaintiffs and Aetna entered into their contracts for the purchase of the trucks in question there were no conditions to delay the effectuation of the contract and no intentions were expressed as to when title to the trucks would pass. The goods were in a deliverable state and there can be no doubt that the subject matter of the contract was specific as there were only 18 trucks all to be allocated to the plaintiffs' orders. By application of the above Rule 1 to the instant case it must be held that title passed the moment the minds of the parties met on the morning of December 6, 1945.

Added weight is given to this conclusion by the terms, "F. O. B. Plant location", contained in the advertisement which carries with it a connotation that the goods would not have to be moved from the plant for title to pass. In effect, it states that the purchasers would be responsible for the goods from the moment the contract is executed and would be responsible for removing them from the plant. Designations relating to shipment appearing on the purchase and processing orders [3] are only shipping instructions and were not part of the contract as orally entered into and therefore have no bearing on the passage of title as contended by the defendant. A similar situation arose in Sadler Machinery Co. v. Ohio Nat., Inc., 6 Cir., 202 F.2d 887, where the parties orally agreed to the terms of a sale and the memorandum of the contract contained the notation "F. O. B. Cars Upper Sandusky, Ohio." The court there held that the terms appearing in the memorandum of the contract had no bearing on the question of when title should pass and meant only that the seller was to load the machines for shipment without expense to the buyer.

It is held, therefore, that since Carroll had full authority to contract for Aetna and while acting for it entered into a valid contract of sale involving passage of title to the plaintiffs prior to the time the trucks were declared to the R. F. C. by the Army Quartermaster Corps, the trucks were not part of the termination

---

**3.** The Wolf Company's written purchase order received by Aetna subsequent to the telephone conversation during which the contract was made provided "Shipping Instructions later." L. B. Smith's written order provided for shipment via the Pennsylvania railroad. Each of these statements was inserted on the respective processing orders by Aetna, Aetna also inserting thereon "F. O. B. Cars-Collect".

inventory of Aetna at the time of the declaration. Subsequent acquisition of the trucks by the R. F. C. was a taking of the property of plaintiffs without due process of law and without just compensation.

The only problem remaining is that of just compensation.

 Under the Fifth Amendment a property owner is entitled to receive just compensation for property appropriated by the sovereign. Olson v. United States, 1934, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236. Just compensation has been held to be the monetary equivalent of the property taken, and the determination of that amount which shall be such equivalent has been held to be a judicial function. Monongahela Navigation Co. v. United States, 1893, 148 U.S. 312, 325–328, 13 S.Ct. 622, 37 L.Ed. 463. The owner is entitled to be put in as good a position pecuniarily as it would have occupied if its property had not been taken. United States v. New River Collieries, 1923, 262 U.S. 341, 343, 43 S.Ct. 565, 67 L.Ed. 1014; Seaboard Airline Ry. Co. v. United States, 1922, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664 and cases cited.

This court in Dore v. United States, 1951, 97 F.Supp. 239, at page 243, 119 Ct.Cl. 560, at page 581, presents a statement of the principles involved in determining the amount that constitutes just compensation wherein, it states as follows:

"In determining what is 'just compensation,' each case must be decided upon its individual facts; no formula, no rigid rules exist for determining what is 'just compensation' under all circumstances and in all cases. [Cf. United States v. Commodities Trading Corp., 339 U.S. 121, 123, 70 S.Ct. 547, 94 L.Ed. 707; Lord Manufacturing Co. v. United States, 84 F.Supp. 748, 114 Ct.Cl. 199; Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463; Kimball Laundry Co. v. United States, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765.] Courts are guided to their conclusions by certain broad principles,

well known, often quoted, and often difficult of application in specific instances. * * * It is held, generally, that just compensation is the value of the property in a free, open market, [United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336] and that the value is determined as of the date of taking [Brooks-Scanlon Corp. v. United States, 265 U.S. 106, 44 S.Ct. 471, 68 L.Ed. 934]. Gain to the taker is held immaterial, loss to the owner being considered a good measure of value. [United States v. Miller, supra.] * * * When there is a free market at time and place of taking, the prevailing price therein is just compensation. [United States v. New River Collieries Co., 262 U.S. 341, 43 S.Ct. 565, 67 L.Ed. 1014].

"When the market upon which a commodity is bought and sold is a controlled market, there exists a strong presumption that the controlled price, fixed pursuant to law, is fair and equitable and that such price is the proper measure of just compensation within the meaning of the Fifth Amendment. This is so because the basic price control legislation enacted in 1942 [Emergency Price Control Act of 1942, 56 Stat. 23, 24, 50 U.S.C.A.Appendix, § 901 et seq.] * * * empowered the Price Administrator to establish such maximum prices as would in his judgment be generally fair and equitable and would effect the purposes of the Act, as stated therein * * *." (Emphasis supplied.)

Plaintiffs contend that because at the time of the taking there was a controlled market, the measure of just compensation should be the OPA ceiling price on the date of the taking which was $5,200 per truck. The defendant contends that there was a free open market because bidders were offering below the cost price of the very trucks in question and the plaintiffs themselves had offered less than the OPA price they now seek to recover herein and also because sales had actual-

ly been made for less than the OPA ceiling.

It is conceded that there can be a market below the OPA ceiling, but simply because bidders were offering less than the maximum price permitted by the OPA would not in our opinion change the market from controlled to uncontrolled, nor would proof of sales at less than the maximum price. This proof might tend to indicate that the market value was not equal to the maximum price permitted and might go toward rebutting the OPA ceiling as the measure of just compensation, but the market would still be controlled since there is a price above which the goods could not be sold.

As the taking of plaintiffs' property occurred during a period when a controlled market existed, there is a rebuttable presumption, indeed, a strong presumption, that the controlled OPA price is the proper measure of just compensation. Such price will stand unless the defendant has overcome the presumption as strengthened by the evidence. We hold on all the evidence that the defendant has not done so in this case.

The only evidence offered by defendant to rebut the above presumption was evidence of four contemporaneous sales to Koppers Company of four trucks at $3,500 per truck, slightly in excess of cost, and of bids by the plaintiffs and others at less than cost and the OPA ceiling. Defendant feels the sales to the Koppers Company establish the price at which the trucks could have been sold on the market at that time and, therefore, is proof of the prevailing market value. Those sales cannot be held to be indicative of the then current market value as they were not ordinary market transactions. They resulted from the efforts of a war contractor to get rid of termination inventory as rapidly as possible so there could be final settlement with the Government on the terminated contract and a subsequent reconversion to peacetime production. In other words, the sales were for less than could have been obtained on the open market by a company with the proper sales facilities and business contacts putting forth their best effort to get the best possible price for their product.

The plaintiffs undoubtedly had such facilities and contacts as they were primarily sales organizations. It is reasonable to conclude that Aetna did not have good sales outlets for the trucks because they had never manufactured them before their contract with the Army and had never sold them to civilian purchasers. The sales by Aetna to Koppers under these circumstances would not establish the prevailing market value, nor do we think that the bids at prices less than cost are evidence of market value. The record shows that none of these bids were accepted and no trucks were sold at less than cost. Market value is established by actual sales, not by unaccepted offers.

A more nearly accurate indication of the market value at that time would be the price at which the Government contracted to purchase the trucks from Aetna, this being $4,542 per truck. We cannot reason, as the defendant insists we should, that market value was $3,500, which was just about the cost of manufacturing, when the Government contracted to buy for $4,542. If this was so, the Government was paying over $1,000 more per truck than they were worth on the market. It seems obvious that the Government was not paying more than the trucks were worth and this is borne out by the fact that the OPA set a ceiling price of $5,200 per truck on them. That ceiling, however, sets the maximum price at which the items could be sold at retail or otherwise. It does not follow, though, that the price of $4,542 per truck paid by the Army was the market value of the trucks in view of the fact that this was the price which the Government negotiated for the purchase of a large number of trucks. We think that the sales to the Army must be considered to have been on the basis of wholesale since 450 trucks were involved in that contract. Individual sales on the market would necessarily be for more per unit than the per unit cost to the purchaser of 450 units.

Plaintiff, L. B. Smith, Inc., two months after the date of the taking, contracted to purchase two trucks identical to the ones in question from the Ross Carrier Company. They had to wait several months for delivery and were required to pay the $5,200 per truck ceiling price for them. Though this sale did not take place at the time of the taking, it certainly indicates that the market for these trucks did not decrease. At any rate, the purchase is sufficiently contemporaneous with the date of the taking to strengthen the already "strong presumption" in favor of the OPA ceiling being the proper measure of just compensation.

Just compensation must take into consideration the purpose for which the property is to be used by the owner. The plaintiffs were, among other things, in the business of buying from war contractors' termination inventory and reselling at a profit. They contracted to buy the trucks in question with the intention of reselling them at a profit and did so only after a survey of market conditions and a determination that the prevailing price was in line with the OPA ceiling. Just compensation must, therefore, allow for the profit that could be had if the goods were sold at prevailing market prices.

In United States v. New River Collieries, supra, the court held that the cost, profit or loss of the owner does not tend to prove market price or value at the time of the taking and permitted recovery by the plaintiff of the cost plus that profit which would have been realized, based on prevailing market prices had the Government not taken the plaintiff's property. In the case at hand, had the Government not taken the plaintiffs' property, it is highly probable they could have sold it for the prevailing OPA ceiling prices. That, then, would be the prevailing market price and the proper measure of just compensation.

Because the defendant did not offer sufficient evidence to rebut the presumption in favor of the OPA ceiling price of $5,200 per truck and because we think the record established that the plaintiffs could have sold the trucks for that price had an effort been expended in that regard, Alpirn v. United States, 1953, 113 F.Supp. 681, 126 Ct.Cl. 142, and for the reasons outlined above, we must conclude that the OPA ceiling price of $5,200 per truck is the proper measure of just compensation and the plaintiffs are entitled to that amount, as adjusted by a deduction for the contract cost price and completion costs of $50 per truck, plus interest at the rate of 4% per annum from the date of the taking, which date is the date of the declaration of the trucks to the R. F. C., December 11, 1945. Agreements between R. F. C. representatives and Lt. Melcher on December 6, 1945, did not constitute a declaration as Lt. Melcher on his own had no authority to declare the property surplus. This authority was vested in his superiors. Action by the superiors was not taken until December 11 when they issued a written declaration of surplus which purportedly transferred the trucks in question to the Reconstruction Finance Corporation.

Completion costs are determined to be $50 despite the fact that the plaintiffs' contracts with Aetna provided that the cost was not to be in excess of $200, because Aetna actually completed the trucks for $50 per truck for R. F. C.

Accordingly, judgment will be entered for the plaintiff L. B. Smith, Inc. in the amount of $18,859.60 plus interest at the rate of 4% per annum from December 11, 1945, and for The Wolf Company for $15,087.68 plus interest at the rate of 4% per annum from December 11, 1945.

It is so ordered.

LARAMORE and MADDEN, Judges, concur.

WHITAKER, Judge (dissenting).

I cannot agree on the amount allowed as just compensation, in view of the inability of the contractor to sell these trucks to anyone for more than the inventory cost, although much effort was put forth to do so.

Of the 100 trucks in the inventory all but 22 were taken by various Government agencies; but the majority opinion states, "Efforts by Aetna after termination [which was on August 14, 1945] to dispose of the remaining 22 trucks were unsuccessful," and so it was decided to publicly advertise them for sale in selected newspapers. This was done on November 16 and 19, *but no bids for as much as the cost price of $3,264.04 were received.*

Later, however, 4 were sold to the Koppers Company for $3,500 each. This left 18. Plaintiff made several offers for these at less than cost, but, so far as the record shows, no other offers were received until the offer of the Reconstruction Finance Corporation on December 6.

The OPA price was a ceiling price, not a floor price. It set the top limit for what an article could be sold, but there was no assurance that this price could be obtained. In war time, prices were high, but when the war was over, many prices dropped sharply. These trucks must have been the sort of materials that were in great demand during the war, but for which there was not a widespread peacetime use; otherwise better bids for these trucks would have been received.

The Government paid $4,542 each for 78 of these trucks, but was not willing to pay this price for the 22, but finally agreed to pay the invoice price of $3,-264.04 for them. Should we now require it to pay more? Plaintiffs were also willing to pay this price, thinking they could sell them at a profit. It is reasonable to suppose they could have, in view of the Government's purchase of the 78 at $4,542. They should not be deprived of this profit.

A reasonable profit, it would seem, would be from 25 percent to 33⅓ percent. Twenty-five percent would amount to $816; 33⅓ percent, to $1,088. I think just compensation to the plaintiffs would be the average of the two, or $952 per truck. From this is to be deducted the cost of putting the trucks in condition, of $50 per truck, leaving a balance of $902.

On this, of course, plaintiffs are entitled to interest for delay in payment, which should be at four percent per annum.

JONES, Chief Judge, joins in the foregoing dissent.