**HOUDAILLE INDUSTRIES, Inc. (Formerly Known as Houdaille-Hershey Corporation)**

v.

**The UNITED STATES.**
No. 155–53.

United States Court of Claims.
May 8, 1957.

Leon D. Ratcliffe, Detroit, Mich., for plaintiff. Charles Wright, Jr. and Beaumont, Smith & Harris, Detroit, Mich., were on the briefs.

Philip W. Lowry, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

This is a suit to recover $420,212.46 claimed to have been expended by plaintiff on account of its contract No. W–7405–eng–149 (hereinafter referred to as contract 149) with the Manhattan District of the War Department.

The claim is based upon excess unemployment compensation taxes which plaintiff was required during the years 1947 through 1950 to pay to the State of Illinois by reason of its operation under the contract of a Government-owned plant at Decatur, Illinois, on a cost-plus-fixed-fee basis. The plaintiff would not have been required to pay

these excess taxes were it not for the adverse effects of its employment and unemployment experience under the above contract upon its rates of contribution in the form of taxes for those years. Plaintiff's rates of contribution were adversely affected during those years because of the substantial employment at the Government-owned plant and the terminations of employment in large numbers beginning in February 1945, and steadily increasing to and beyond the termination of production operations on November 21, 1945. These layoffs ultimately resulted in the filing and payment of claims for benefits to unemployed claimants in substantial numbers pursuant to the provisions of Illinois law. The amount of the claim represents the difference between the sum of the unemployment compensation taxes actually paid by the contractor for the years in question, and the sum of the taxes it would have been required to pay had its operations been confined to its three nongovernmental plants. Plaintiff contends that it would not have had to pay these additional taxes except for the adverse effect of its operations under the Government contract upon its postwar corporate rate of contribution, and that such costs are reimbursable. Suit is brought under the Contract Settlement Act of 1944, 41 U.S.C.A. § 101 et seq., 58 Stat. 649, on the ground that the contract was terminated on November 21, 1945, within the purview of the terms of that act; and, alternatively, suit is brought on the theory of contract, plaintiff alleging that the amount claimed is reimbursable under the provisions of the contract relying specifically on subsections g, i, m, t, and w of article IX thereof. If the plaintiff is sustained on the former theory it will recover in addition to the amount claimed, interest at the rate of 2½ percent per annum, 41 U.S.C.A. § 106(f), otherwise the recovery will be only for the sum claimed. A third alternative theory, that of accord, as also pursued but is not necessary to the decision of the case.

Defendant disputes plaintiff's right to recover on any theory and asserts that even if there is otherwise a valid claim, that plaintiff relinquished the right to it on January 25, 1950, by virtue of a release executed by it and transmitted to the Government's representative, a Mr. Hungerford.

Thus, the issues presented to the court for determination in this action are: (1) Did the plaintiff release any valid claim it may have had against defendant by its release executed on January 25, 1950?; (2) Do plaintiff's claimed expenditures fall within the contractual provisions relative to reimbursable expenses?; (3) Was the contract *completed* according to its terms, or was it *terminated* within the meaning of the Contract Settlement Act, supra?; (4) If it should be decided that plaintiff has a valid recoverable claim and that the contract was terminated within the purview of the Contract Settlement Act, supra, from what date or dates is plaintiff entitled to interest?

In order to resolve these issues it is necessary to review the facts which may be stated as follows:

Plaintiff, a Michigan corporation, prior and subsequent to its performance under contract 149 with defendant, operated three manufacturing plants in the State of Illinois which will hereinafter be referred to as its peacetime plants. A fourth manufacturing plant in that state was set up at Government expense by plaintiff on plaintiff's land at Decatur, Illinois, pursuant to the terms of the contract and was known as the Garfield Division of Houdaille-Hershey Corporation even though the Government retained title to the buildings. This plant was engaged only in the work called for by contract 149 and certain operations under a related contract, W–7405–eng–55 (hereinafter referred to as contract 55), which is in no way the subject of the claims here in suit.

Contract 149 was of the cost-plus-fixed-fee type. Title I thereof called for plaintiff to design and have a building

built at Decatur, Illinois, and procure and install the necessary manufacturing equipment for the production of highly secret materials for the Government. Title II called for the production of a specified number of units of certain classified materials. The cost under both titles was estimated therein. The fixed fee provided for was $200,000 under title I and $650,000 under title II. Production was to start as of February 1, 1944, with completion scheduled for 11 months. Provisions, however, were made for extensions as well as additional fees if more time was needed to complete the contract.

A standard termination provision was contained in article IV giving the Government the right to unilaterally terminate the contract at any time and providing for the payment of expenses under article IX, as well as for payment of the full fee called for by the contract in the event of termination.

Article IX provided for reimbursement of the plaintiff's expenditures as follows:

"1. *Reimbursement of Contractor's Expenditures.* The Contractor shall be reimbursed in the manner hereinafter described for such of its actual costs and expenses in the performance of the work under this contract, as may be approved or ratified by the Contracting Officer 'Actual costs and Expenses' as used in this Article shall include the following only."

Following were some 23 sections spelling out those expenditures specifically reimbursable. Among those were the following within all of which plaintiff claims its expenditures here in suit fall:

"*g* The cost of losses or expenses not compensated by insurance or otherwise (including settlement made with the written consent of the Contracting Officer) actually sustained by the Contractor in connection with the work and found and certified by the Contracting Officer to be just and

reasonable unless reimbursement therefor is expressly prohibited; provided that such reimbursement shall not include any amount for which the Contractor would have been indemnified or compensated by insurance except for the failure of the Contractor to procure or maintain bonds or insurance in accordance with the requirements of the Contracting Officer.

"*i* Payments from its own funds made by the Contractor under the Social Security Act [42 U.S.C.A. § 301 et seq.] and any disbursements required by State and Federal law, including sales and any use taxes, which the Contractor may be required, on account of this contract, to pay on or for any plant, equipment, processes, organization, and materials, supplies or personnel; and, if approved in writing by the Contracting Officer in advance, permit and license fees and royalties on patents used, including those owned by the Contractor.

"*m* Expenditures of the Contractor in connection with the termination of this contract, pursuant to Article IV.

"*t* Such other items not expressly excluded by other provisions of this contract as are, in the opinion of the Contracting Officer, to be included in the cost of the work. When such an item is allowed by the Contracting Officer, it shall be specifically certified as being allowed under this subsection.

"*w* Expenditures of the Contractor in connection with allowances and benefits relative to employment, including those relating to overtime, hospitalization, sickness, leaves, vacations, holidays and the like. * *"

Article IX 2. *a* and *b* provided for the manner of payment of the costs and fees of the contractor.

Other articles provided for disputes, accountability of property and the like.

Article XXXIV entitled "Changes" provided in part as follows:

"Article XXXIV. Changes

"The Contracting Officer may at any time, by written order issue additional instructions, require additional work or services or direct the omission of work or services covered by this contract. If such changes cause a material increase or decrease in the amount or character of the work and services to be done under this contract an equitable adjustment of the amount of the fixed fee to be paid the Contractor shall be made and the contract shall be modified in writing accordingly. * * *"

These and other applicable sections of the contract are more fully set out in finding 8.

On the basis of article XXXIV above, six separate amendments were made to contract 149. The essence of the first four of these was to extend the time for performance of the contract and adjust the costs and fees payable. After modification number four, the date of completion called for was February 28, 1946, and the number of units called for was 8,796,000. The amounts of estimated costs and the fixed fees had also been increased considerably over the initially specified amounts.

It was under the contract in this status that plaintiff was operating when on November 21, 1945, the following telegraphic communication from a contracting officer of the Manhattan project in New York City was received at plaintiff's home office in Detroit, Michigan:

"Under provisions of Contract W-7405-eng-149 it is desired that you terminate production operations at the Garfield plant and place equipment in permanent stand-by condition. You will take all necessary steps to protect Government property and will be reimbursed for this cost in accordance with provisions of the contract."

Subsequent to November 21, 1945, and on December 29, 1945, Supplemental Agreement No. 5 was entered into and signed by both plaintiff and defendant. That supplement provided for adjustments in the costs and fixed fee provisions of the contract as they then stood. It further provided in pertinent part as follows:

"Whereas, It is found advantageous and in the best interests of the United States to further modify the said contract for the following reasons:

"(a) To terminate production activities under the contract as of 21 November 1945.

"(b) To allow for the Contractor to place the plant in a stand-by condition and protect the Government-owned equipment and property against the elements so that the plant can be easily maintained for a two year period of time. * * *"

Prior to this supplement there was no provision in contract 149 or the first four supplements thereto requiring plaintiff to place the plant and equipment in a standby condition.

Supplement 6 executed on February 6, 1946, provided for the contract period to be extended to May 31, 1946, to provide for the completion of certain listed operations which were incident to the termination of the contract.

Because of the urgency of the need for the materials called for by contract 149, after its execution plaintiff was required to rapidly expand its working force at the Garfield plant with a peak employment of 4,634 being reached during the week of February 3, 1945. In order to do this, employees were recruited from various parts of the country with their transportation to the place of employment paid. Special arrangements were made to house them and trailer parks as well as other means of temporary housing were utilized. Women in large numbers and off-season agricultural workers were also

employed. All in all, over 7,400 employees were used to expedite production during the performance of contract 149. Because of a decreasing demand with the end of the war in sight, the number of employees steadily decreased from the time of peak employment until production was ordered terminated on November 21, 1945, and on that date there were only between 500 and 600 employees.

Prior, however, to the order to cease production, the employees at the Garfield plant on November 14, 1945, went on a "wildcat" strike because of dissatisfaction with the reduction of the workweek to 40 hours and the curtailment of all overtime. The result was a much smaller take-home pay than the employees had been used to during the wartime days of much overtime.

Union officials were advised on November 21, 1945, of the receipt of the above-quoted cease production communication but refused plaintiff's request to put into the plant a limited number of employees for the purpose of finishing the work in process and placing the plant in a stand-by condition until their original strike demands were met. After further negotiation, the results of which officials of the Manhattan District were apprised, the following telegram was received from a contracting officer at Oak Ridge, Tennessee, after which the union agreed to allow its members to enter the plant if the plaintiff agreed to comply with the authorization contained therein:

"Authorization is granted the Houdaille-Hershey Corporation to work all employees six 8 hour days or 48 hours per week. Whose services are required to put the Garfield plant in a standby condition. [sic] Time and one-half payments will be made to personnel normally receiving overtime for work performed on the sixth day of the work week as being in excess of 40 hours and not as such. Employees who have not worked at least 40 hours during the first 5 days of the work week should not be permitted to work on the sixth day. No authorization is available for seventh day work or Sunday work at double time. Should this proposal be acceptable to the contractor and the union the contractor will proceed as rapidly as possible to terminate all employees whose services are not longer needed as this authorization is granted for a limited period only."

Plaintiff agreed to comply with the authorization and, thereafter, on November 26, 1945, the picket lines were withdrawn and the strike was considered settled. Many of those who went on strike on November 14, 1945, however, did not return to work and were terminated because, in light of the Government's order, there was not enough work to warrant employment of all such employees.

Of the more than 7,400 former employees of the plaintiff at its Garfield Division under contract 149, approximately 3,500 filed claims for and were paid benefits under the Illinois Unemployment Compensation Act, S.H.A. ch. 48, § 217 et seq. following the termination of their employment by plaintiff.

After hearings by the Department of Labor of Illinois on the initial claims of these former employees, it rendered a decision that those employees who went on strike were not entitled to recover for the period from November 14, 1945, through November 20, 1945, both dates inclusive, and for the week or weeks in which any part of such period occurred and imposed this disqualification under the provisions of section 7(d) of the Illinois Unemployment Compensation Act, Laws of 1937, approved June 30, 1937, effective July 1, 1937, as amended July 18, 1949, 1 Ill.Rev. Stat.1949, c. 48, §§ 217–250, which prohibits the payment of unemployment benefits if the claimant is out of work due to a stoppage of work resulting from a labor dispute at the place of employment. The payment of benefits was permitted to be paid for any period commencing after November 21, 1945. The Department of Labor of Illinois was satisfied that the strike at the company did not continue after that date because of the notification from the Government to the plain-

tiff to cease production. The determination of the deputy which was affirmed by the Director of Labor of the State of Illinois after a subsequent hearing before him, concluded as follows:

"It is the conclusion of the Deputy that on and after November 21, 1945, the co-existence and causality between the stoppage of work and the labor dispute ceased and the unemployment of production and maintenance workers on and after that date was due to a shut-down of production operations rather than to a stoppage of work which 'existed because of a labor dispute.' "

At all times involved in this case and for more than three years prior to entering into contract 149, the plaintiff, as a corporate employer in the State of Illinois, was and is now subject to the provisions of the Illinois Unemployment Compensation Act, supra, and as such employer, plaintiff was and is required to make contributions to the Department of Labor, Division of Placement and Unemployment Compensation of the State of Illinois, in amounts computed upon its taxable wages in the State of Illinois. "Taxable" wages, or wages on which contributions are required to be paid, include wages of individual workers up to and including $3,000 during any calendar year but not wages in excess of $3,000 for any calendar year. Such contributions become due and are required to be paid quarterly on or before the last day of the month next following the calendar quarter for which such contributions have accrued.

Beginning with the calendar quarter ending June 30, 1943, and continuing through the calendar quarter ending June 30, 1946, plaintiff made contributions under the Illinois act in amounts totaling $729,369.89, of which sum $388,748.14 was attributable to taxable wages paid employees at the Garfield Division in connection with employment under contracts 55 and 149. Plaintiff was reimbursed this sum by the Government upon sub-mission of properly documented vouchers under the provisions of each contract. Plaintiff's claim here does not relate to these amounts in any way.

However, during the period that followed the performance of contracts 55 and 149, the years 1947 through 1950, plaintiff was required to continue to make contributions which were based in part on its employment-unemployment experience under contract 149. The result was that during those years plaintiff paid much greater contributions than it would have had it never entered into contract 149. It is for the difference between that which would have been paid had experience under contract 149 not entered into the computations and that actually paid for which the plaintiff is here suing. That amount as proven on trial is $420,212.46.

Under the Illinois act, in the case of a corporate employer having more than one plant or operating division in the state, the rate of contribution is determined for the corporation as a unit and not for each individual plant or division. The rate of contribution is based upon statistics covering a 36-month period ending June 30 of the year preceding that for which the rate is determined and takes into consideration, among other things, the employer's employment-unemployment experience for that period.[1] After the rate of contribution is found, it is applied against the "taxable wages" hereinbefore referred to to get the dollar amount of the quarterly contributions. Because of this method of computation, plaintiff's employment and unemployment experience under contract 149 operated adversely to plaintiff in that determined rate of contribution up until and including the year 1950 resulted in contributions which were higher by the claimed amount than they otherwise would have been.

The contribution rate differential of the plaintiff due to the adverse effects of plaintiff's employment and unemployment experience under contract 149, plaintiff's taxable wages and the amount of addi-

---

[1]. The complete formula used by the state of Illinois in determining the contribu-tion rate is explained in full in finding 18.

tional contributions which plaintiff was required to pay for the years 1947 through 1951, inclusive, because of contract 149 are as follows:

| Year | Contribution Rates Inclusive of Experience Under Contract 149 Which Was Paid | Contribution Rates Exclusive of Experience Under Contract 149 Would Have Been | Contribution Rate Differentials Due to Effects of Experience Under Contract 149 | Plaintiff's Taxable Wages in State of Illinois on Which Contributions Were Paid | Additional Contributions Required of Plaintiff Because of Effects of Experience Under Contract 149 |
|---|---|---|---|---|---|
| | *Percent* | *Percent* | *Percent* | | |
| 1947 | 2.5 | 1.0 | 1.5 | $5,908,276.20 | $88,624.14 |
| 1948 | 3.6 | 1.0 | 2.6 | 6,178,425.61 | 160,639.07 |
| 1949 | 3.6 | 1.5 | 2.1 | 7,075,290.53 | 148,581.10 |
| 1950 | 1.25 | .75 | .5 | 7,041,268.97 | 35,206.34 |
| 1951 | 1.0 | 1.0 | 0 | 6,293,412.50 | 0 |
| Total | | | | | 433,050.65 |
| Less credit for year 1945 hereafter described.. | | | | | 12,838.19 |
| Net amount... | | | | | 420,212.46 |

The overall result of the amounts of contributions to the State of Illinois during the years 1947 through 1950 is that the plaintiff paid $420,212.46 more in contributions because of its experience under contract 149 than it would have if its contribution rate was based only on the operations of its three normal peacetime plants which would necessarily exclude any experience plaintiff had under contract 149.

In January 1944, the plaintiff employed Frank C. Hungerford and placed him in charge of the contracts and claims division of its Garfield Division. He had previously been a civilian engineer with the United States Corps of Engineers when, in January 1944, he obtained a leave of absence to enter plaintiff's employ where he remained until May 31, 1946, when contract 149, according to supplement number 6, came to an end. He then returned to civilian employment with the Corps of Engineers the following day, June 1, 1946, in the capacity of resident engineer at the Garfield plant.

Contract 149 was originally executed with the Manhattan District of the then War Department and the Garfield plant was under its control and ownership. However, on December 31, 1946, pursuant to section 9 of the Atomic Energy Act of 1946, 42 U.S.C.A. § 1809, 60 Stat. 765, and Executive Order 9816, 42 U.S.C.A. § 1802 note, it was transferred to the Atomic Energy Commission. Thereafter, the Oak Ridge Operations Office of the Atomic Energy Commission had the authority and the responsibility for administration of contract 149 and for the payment of claims thereunder and it actually paid two claims on contract 149 thereafter.

As of the effectuation of the transfer of the property to the Atomic Energy Commission, Mr. Hungerford became a civilian employee of that Commission but remained assigned to the Garfield plant. In January 1950 while still in the employ of the Atomic Energy Commission, Hungerford came to Detroit with two release forms which he urged plaintiff to sign alleging that the forms were necessary to meet the administrative requirements of the Government and that there was no reason why plaintiff should not sign them because he (Hungerford) knew from his own experience as a former employee of the plaintiff in connection with contract 149, that there were no claims under that contract. He also stated that if there were any unknown claims, they were excepted by paragraph (b) of the release forms. The plaintiff at that time was unaware that the claims which it is now pursuing were reimbursable under the

contract and contrary to advice of counsel, signed the forms, under corporate seal, on January 25, 1950. No payment or anything of value was given over by defendant at the time these forms were signed. The release follows:

"Release

"The work under Contract No. W-7405-eng-149 dated June 10, 1943, between the United States of America and the undersigned contractor, having been completed and finally accepted, the United States of America, its officers and agents, and each of them, are hereby released from all claims and demands whatsoever arising under and by virtue of said contract, except as follows:

"(a) Claims in stated or estimated amounts—None.

"(b) Any and all claims arising out of the performance of said contract based upon the responsibility of the undersigned Contractor to third parties, not known at the time of executing this release.

"Executed this 25th day of January, 1950.

"[Corporate seal]"

Plaintiff first became aware of the reimbursable nature of the claim now being asserted in the spring of 1951, upon learning of the decisions of the Appeal Board, Office of Contract Settlement in the Certain-Teed Products Corporation, 4 App.Bd. OCS No. 317, p. 157; and the Hercules Powder Company, 5 App.Bd. OCS No. 342, pp. 24 and 59, cases while attempting to work out provisions for another cost-plus-fixed-fee Government contract.

The plaintiff then commenced an analysis and examination of its employment records at all of its plants for the purpose of determining the extent that contract 149 adversely affected its contribution rates so as to make a claim for the recovery of the excess payments. The claim was first mailed to the Atomic Energy Commission at Oak Ridge, Tennessee, on August 4, 1952. In reply to this claim the plaintiff was advised by the manager of the Oak Ridge Operations of the Commission that to determine the outcome of the claim it was necessary to make an initial determination as to whether the claim was properly a termination claim, as presented, or whether it was recoverable under the terms of the contract notwithstanding the Contract Settlement Act. In the same communication plaintiff was advised that the claim was being referred to the Contract Board of that office to make that determination and instructed plaintiff to conduct any further negotiations on the matter with Mr. John R. Moore, Chairman, Contract Board, Oak Ridge Operation. A conference was had between plaintiff and that board, the board taking the position that plaintiff should file its claim in voucher form as a reimbursable item under the contract rather than as a termination proposal because it was felt that the contract had not been terminated. Mr. Moore told plaintiff that because of the size of the claim it would after receipt in the form above noted, be forwarded to the General Accounting Office. He also said that the Oak Ridge Operation Office would recommend to the Atomic Energy Commission, in Washington, D. C., that the claim be considered a reimbursable cost under the contract. The plaintiff thereafter submitted its claim in voucher form and omitted any reference to the termination of the contract but attached thereto a memorandum within which plaintiff reserved any rights it may have had under the Contract Settlement Act because of a terminated contract. The Commission thereafter verified the claim and forwarded it with a memorandum dated March 23, 1953, and over the signature of Mr. Vanden Bulck, Assistant Manager to the Controller of the Atomic Energy Commission, Washington, D. C. Mr. Bulck, and the aforementioned Chairman of the Contract Board, Mr. Moore, each of whom was a contracting officer at Oak Ridge and with authority to settle all claims on contracts in amounts not in excess of $500,000, cooperated in the preparation of the memorandum. That memorandum supported

the validity of plaintiff's claim wherein it stated as follows:

" * * * For reasons hereinafter stated, and also set out in detail in the contractor's memorandum in support of the Form 1034 cost voucher, it is our opinion, based on the advice of counsel, that the costs constituting the basis of this claim are reimbursable under the terms of the contract. However, due to the novelty of the case and the large sum involved, we are suggesting that the claim be submitted to the Comptroller General for an advance determination as to the propriety of payment."

The Chairman of the Atomic Energy Commission on June 8, 1953, transmitted the claim to the Comptroller General of the United States who on July 1, 1953, by the Acting Comptroller General, in a letter to the Chairman of the Atomic Energy Commission denied the claim by decision No. B–115683. That decision was in turn transmitted to the plaintiff on July 24, 1953, whereupon on September 22, 1953, the plaintiff made demand for written findings by the Atomic Energy Commission pursuant to section 13(a) of the Contract Settlement Act of 1944, supra. The Commission subsequently notified plaintiff that it was reiterating its position that the contract was completed rather than terminated and thus was outside the scope of that act. The Commission accordingly refused to submit findings. Section 13(c) (2) (iii) of the Contract Settlement Act, supra, provides that in the case of failure to deliver such findings, the plaintiff has the right within one year after his demand therefor to initiate proceedings in the Court of Claims in accordance with section 13(b) of that Act.

To prevent the running of the statute of limitations during the pendency of its claims with the Atomic Energy Commission, plaintiff's original petition was filed in this court on April 17, 1953, on the basis of its claim under the contract. The subject matter of that original petition is now that which is contained in count II of plaintiff's second amended petition. On December 11, 1953, within the 1-year limitation above referred to, plaintiff filed its first amendment to its petition, adding as count I a count based upon its termination claim. Pursuant to the Contract Settlement Act, supra, the plaintiff had the option of appealing the agency's decision to either the Office of Contract Settlement Appeal Board, or the Court of Claims. While it would have been more advantageous from the plaintiff's point of view to appeal to the Appeal Board because that board had previously decided two cases, Certain-Teed Products Corporation and Hercules Powder Company, supra, squarely on point with the instant one in the favor of the plaintiffs, the plaintiff was unable at this time to appeal to that board as it was abolished by the Act of July 14, 1952, 66 Stat. 627, effective midnight January 13, 1953, 41 U.S.C.A. § 113 note.

First in the order of consideration must be whether the release executed by plaintiff on January 25, 1950, is of such a nature to bar plaintiff from recovering its claims in this case. While the litgants quite naturally take opposite views of the exception contained in clause (b) of the release hereinbefore quoted, we do not think we have to determine whether plaintiff's claim in this case is of the type intended to have been excluded by that exclusory clause. This because we feel the release in itself is not valid due to a complete lack of consideration.

Defendant argues that the release was executed by plaintiff under seal, and, therefore, no proof of consideration is necessary at common law. Nevertheless, defendant goes on to point out that there *was* consideration and lists three separate items, each of which it contends represents a sufficient consideration to make the release valid.

First, it points to a paper entitled "Final Acceptance" which was handed to plaintiff immediately after plaintiff executed the release. The final acceptance stated in full follows:

"Final Acceptance
"Contract No: W–7405–eng–149
"Contractor: Houdaille-Hershey Corporation.

"This is to certify that all work required under Contract No. W–7405–eng–149, as amended, has been completed; that the work has been inspected by me or my duly authorized assistants and has been found to comply with the terms and conditions of the purchase instrument and the specifications governing same. Therefore, all work under the contract is accepted on behalf of the United States Government on this 11th day of January, 1950.

"[Signed] R. W. Cook,
"R. W. Cook,
"Contracting Officer"

This final acceptance is certainly not consideration for the release, as the record shows without a doubt that the acceptance was not mentioned to plaintiff prior to the time the release was executed and, contrary to the defendant's assertion, it was not attached to the release when it was executed. Plaintiff did not even know it was going to receive it when the release was signed. We certainly cannot hold a document adequate consideration for the execution of another document when it did not enter into the negotiations and plaintiff was unaware that it would receive it. It was not bargained for by plaintiff. Moreover, the document by its own language accepted the work performed under the contract as of January 11, 1950, a full two weeks before the release was executed. The acceptance also makes no mention of the release. Had this final acceptance been what was bargained for by plaintiff or accepted as a return for signing the release, defendant's assertion that it is adequate consideration could be sustained but that is not the case here.

Secondly, defendant asserts that a recital in the release itself that the contract was "completed and finally accepted" constitutes sufficient consideration to support the release as the acceptance came from the defendant.

As to this contention, it should be pointed out that the alleged release was signed only by plaintiff, thus the quoted language was plaintiff's notwithstanding the fact that the defendant prepared it. We fail to see how this recitation by the plaintiff in the release can represent adequate consideration therefor. The language used by the plaintiff did not refer to something which it was accepting as consideration for the release. Plaintiff did not say that the release was executed in consideration of the acceptance by the Government of the work. It stated only that the work was already completed and only *referred* to that prior acceptance. Moreover, the work under the contract had been accepted almost four years earlier. Therefore, the recital relied upon by defendant can refer only to past consideration, if consideration at all, which the law of contracts treats as no consideration.

In Pneumatic Gun-Carriage & Power Co. v. United States, 36 Ct.Cl. 71, we said that nothing can be treated as consideration that is not intended as such by the parties. The record in this case shows that the parties in suit not only did not intend the language quoted by defendant to be consideration but that plaintiff objected to it even being in the purported release. Upon being told by defendant's representative, Hungerford, that he didn't have the authority to change the wording, plaintiff consented to leaving it in. This, however, would not in itself transform that language into a consideration flowing from the defendant to the plaintiff. It was certainly not intended by either party at that time as being consideration for signing the release.

Thirdy, defendant alleges that a classified material receipt given by defendant to plaintiff thereby relieving plaintiff of responsibility for future safety of certain classified material for which it had been previously responsible constituted adequate consideration for the release. The

very simple answer to this argument is that the receipt was given for the return of the classified material itself which classified material was turned over to defendant the day before and not as consideration for the release executed unilaterally by plaintiff. The classified material could have been turned back at any time and without the signing of the release.

The release here in question is not comparable to those releases given in connection with many Government contracts wherein the last payment under the contract is held up until the plaintiff executes the release. In such case, the payment of the last installment constitutes the consideration for the release. Nor does this case involve a situation where the contract calls for a release. In such cases the contract itself is the consideration for the release. In the case at hand, the contract did not provide for the execution of the release and the last payment made to plaintiff under the contract had been made almost three years prior to the execution of the release.

■ Defendant, nevertheless, insists that since the release was under seal, no consideration is needed and relies on the common law to support this view. To determine the validity of the release in question we must apply the usual rules of contract. The nature, validity and interpretation of contracts are to be governed by the law of the state where the instrument was executed, L. B. Smith, Inc. v. United States, Ct.Cl., 145 F.Supp. 216, 223, and cases cited therein. This court has consistently followed that rule, thus to determine the applicability of the common law rule relied on by defendant we must look to the law of the State of Michigan since it was in Detroit that the release was signed by plaintiff.

■ Prior to its modification by statute, a seal on an instrument in the State of Michigan was held to import consideration, and no consideration as such had to be shown. That common law rule, however, has been changed by statute and Michigan now operates under the following modification of the significance of an instrument under seal:

"Sec. 46. In any action upon a sealed instrument, and where a set-off is founded on any sealed instrument, the seal thereof shall only be presumptive evidence of a sufficient consideration, which may be rebutted in the same manner, and to the same extent, as if such instrument were not sealed." Mich.C.L.1948, Sec. 617.46.

Thus, it is clear that the status of the seal in Michigan no longer is of import similar to that accorded it under unaltered common law. The seal constitutes only a rebuttable presumption of consideration in Michigan today. The plaintiff in this case, as pointed out above, has adequately rebutted the presumption of consideration.

■ Moreover, consideration or not, we feel that the subsequent actions of the contracting agency would negate any binding effect the release may have had. After the plaintiff made its initial claim to the Atomic Energy Commission, the Commission did not treat its recovery as being barred by the release. At a matter of fact, from the beginning the Commission thought it was recoverable and so informed the plaintiff. The Commission differed with plaintiff on its assertion that it was a termination claim, but did concede that it was recoverable under the provisions of the contract itself. Mr. Bulck, in his memorandum to the Controller of the Atomic Energy Commission in Washington, D. C., on March 23, 1953, stated that in his opinion the claimed expenditure was a reimbursable item. Mr. Bulck had the duties of, and was considered a contracting officer, and had the authority to settle claims under $500,000. Thus, the subsequent actions of the contracting agency, even if the release could otherwise be considered legally binding, would vitiate the binding effect thereof. If the contracting agency had the authority to accept the release, it must also have had the authority to lift the bar it effected if it so desired. Its subsequent actions indicate that it did just that.

We hold, therefore, that the purported release signed by plaintiff on January 25, 1950, is not a bar to its recovery of the claims here in suit, that the seal on the release is ineffectual to support defendant's contention that it does not have to show a consideration, and that the release is not supported by consideration of any nature.

As hereinbefore noted, the plaintiff in attempting to sustain its subject claim argues in the alternative. Primarily, it argues that the contract was terminated within the purview of the Contract Settlement Act of 1944, supra, and that it is entitled to reimbursement based upon the provisions thereof. Alternatively, it argues that if the contract is considered by the court to have been completed according to its terms rather than terminated, it can, nevertheless, recover under the specific terms of the contract relying on article IX, subsections *g, i, m, t,* and *w,* thereof which have hereinbefore been quoted in full.

Defendant contends that the contract was not terminated and points to the reply by the contracting agency to plaintiff's request of November 30, 1945, that it be informed of the article of the contract under which cessation of production was ordered. The contracting officer replied to this request on December 1, 1945, stating that the action had been taken under article XXXIV of the contract, which is entitled "Changes" and is hereinbefore quoted in full. That section of the contract permitted the Government to unilaterally modify the contract which, up to this time, it did on four occasions. The essence of the defendant's argument on this issue is, therefore, that the Government's order of November 21, 1945, terminating production was no more than a modification of the contract as it then existed, reducing, so to speak, the amount of material plaintiff was required to supply the Government with from the prescribed number to something less. We do not feel that the Government can circumvent the provisions of the Contract Settlement Act so easily.

Regardless of the contentions of the parties, we must determine the status of the now completed contract by the substance of the events which stopped production at the Garfield plant on November 21, 1945, and not the form. Thus, the mere fact that the Government said it was merely modifying the contract pursuant to its authority under article XXXIV of the contract does not bar this from being a termination claim if it in fact meets the requirements of the Contract Settlement Act, supra, and the regulations promulgated thereunder.

Section 103(d) of that act states as follows:

"(d) The terms 'termination', 'terminate', and 'terminated' refer to the termination or cancelation, in whole *or in part,* of work under a prime contract for the convenience or at the option of the Government (except for default of the prime contractor) or work under a subcontract for any reason except the default of the subcontractor." [Italics supplied.]

Supplemental Agreement No. 5 of the contract, hereinbefore set forth in pertinent part, was entered into shortly after the receipt on November 21, 1945, of notice to cease production and states that it was to the advantage and in the best interests of the United States to terminate production on November 21, 1945.

The Joint Termination Regulations promulgated pursuant to the Contract Settlement Act by the War and Navy Departments, 10 C.F.R. § 800 et seq. (1944 Supp.), which were subsequently made applicable to the Atomic Energy Commission by Executive Order No. 10216, February 23, 1951, 16 Fed.Reg. 1815, 50 U.S. C.A.Appendix, § 611 note; Atomic Energy Bulletin OR–182, October 16, 1950, contains the following provisions:

"216.1 *When Reductions Permitted.*

"(a) Certain War and Navy Departments prime contracts contain a special 'Changes' article which authorizes the Government, under certain conditions, to reduce by a

change order the quantity of supplies to be delivered under the contract. *Such a reduction is a method of termination* * * *.

"(b) Where a reduction in the quantity of supplies to be delivered under a prime contract appears likely to involve substantial or complicated problems regarding termination inventories or claims by subcontractors, such reduction should ordinarily be effected as a partial termination pursuant to the termination article contained in the contract. * * *

"216.2 *Compensation for such reductions.* * * *

"(c) * * * Since such reduction constitutes a termination under the Act, the prime contractor will be entitled to appeal from such findings or sue in accordance with Section 13 of the Act. J.T.R. 216–1, 216–2; 10 C.F.R. 1944 Supp. 842–216–1, 842–216–2." [Italics supplied.]

The language of supplement 5 seems to make clear that the contract in question was terminated at the Government's convenience, as specified in the definition of "termination" contained in section 103 (d) quoted above, thereby placing the contract squarely within the provisions of the Contract Settlement Act, supra.

Whether that be so or not, it is apparent that the Government's argument that the contract was simply modified under the Changes article cannot be sustained in light of the above-quoted section of the Joint Termination Regulations which specifically makes a reduction in the amount of material called for by a contract a method of termination. While subsequent supplements allowed the work in process to be completed and provided for a contract completion date, the overall situation on November 21, 1945, was that there had been effected a reduction in the amount of materials the plaintiff had to supply the Government with under the contract. This is exactly the type of situation anticipated by the Joint Termination Regulation 216.1 above quoted. The effect of the Government's action was, at the very least, a

*partial* reduction in the amount of production called for by the contract which, according to section 103(d) above, constitutes a termination for the purposes of the act.

We hold, therefore, that plaintiff's contract was terminated within the meaning of the Contract Settlement Act of 1944, supra.

■ We further hold that expenditures of the nature here sued for are expressly provided for by the terms of the contract and, therefore, the plaintiff is entitled to recover the amount claimed.

Subsection *i* of article IX of the contract, hereinbefore quoted, explicitly covers the type of expense in question. That section says that *any* disbursements required to be made by the contractor by state law on account of the contract relative to personnel, among other things, is a valid reimbursable expense under the contract. The contributions which the plaintiff in this case made to the State of Illinois were certainly required by that State's law and, if not paid, plaintiff would have subjected itself to certain penalties called for by the state statutes.

Subsection *m* is applicable and plaintiff would be entitled to recover thereunder since, as previously noted, we have decided that the contract was terminated. This subsection is reciprocal with article IV 3.*b* which provided for the payment of expenditures in accordance with article IX in the event of termination of the contract.

Subsection *t* of the same article IX also covers the expenditures in question. It is a catchall clause providing for the payment of all items of expense not expressly excluded by other provisions of the contract. While the subsection specifies that the payment of such additional expenses is contingent upon the contracting officer's opinion that they should be included in the cost of the work, we feel that it nevertheless applies to the claims under consideration since a contracting officer of the Atomic Energy Commission assigned to handle the claims relative to contract 149 and with authority to

settle claims under $500,000 stated orally and in writing that in his opinion the claims were reimbursable under the provisions of the contract. The only reason the claims were not paid thereafter is that the Comptroller General refused to certify their payment.

The defendant contends, however, that even if the contributions here in question are considered to be reimbursable, there is no authority for their reimbursement *after* the contract had expired according to the terms of the supplements thereto. We feel there is absolutely no merit to this argument. The expenses arose on account of plaintiff's operation under the contract and the fact that the amount of the expenditures could not be determined until after performance under the contract had been fulfilled makes them no less reimbursable.

The defendant also makes another argument to the effect that the strike which commenced at the Garfield plant on November 14, 1945, never ended and because of this plaintiff should be barred from recovering the amounts claimed as it should have contested the payment of unemployment compensation benefits that were awarded to employees after November 21, 1945, and which resulted in the assessment of higher contribution rates against the plaintiff. In answer to this we can only reiterate what the Department of Labor of the State of Illinois concluded after hearings on the applications of the former employees of plaintiff for unemployment benefits, to wit, the unemployment of the workers after November 21, 1945, was due to a shutdown of production operations rather than the strike. Moreover, the record shows that plaintiff did have a legal representative at the hearings on the employees' applications.

The defendant makes other assertions which we feel are completely without merit and, therefore, will not be discussed since they will in no way affect our decision as outlined above.

We feel constrained at this point, however, to note that we have taken full cognizance of the Certain-Teed and Hercules decisions, cited supra, which result in an extension of the doctrine of Federal Cartridge Corporation v. United States, 77 F.Supp. 380, 111 Ct.Cl. 372, and we are in complete agreement with those cases.

In the Federal Cartridge case recovery was sought for taxes plaintiff was required to pay on account of its performance under a cost-plus-fixed-fee contract with defendant the liability for which occurred *during* the performance of the contract. Recovery was allowed by this court.

The Certain-Teed and Hercules cases present situations almost identical with the one before the court in the instant suit in that they were claims for the reimbursement of unemployment compensation taxes paid under the respective state laws in years subsequent to the termination of the contracts and the liability for which arose *after* the termination. The appeals Board in those cases allowed the recovery of the claims on the basis of the Federal Cartridge decision.

We feel that the board was correct in extending the doctrine of Federal Cartridge to a situation where the liability for the taxes paid as a result of performance under the Government contract arose *after* the termination. As in the instant case, so long as the expenditure arose on account of the contractor's performance under the contract, and the expenditure is not otherwise excluded from payment by other provisions, the mere fact that liability cannot be determined until after the termination or completion date of the contract is no reason to penalize the contractor to the extent of its subsequent payments which are attributable to the Government contract.

The only matter left for our consideration is the question of interest. Since we have decided that the contract in question was terminated within the purview of the Contract Settlement Act, supra, the contractor is entitled to interest in accordance with section 106(f) of that act. That section of the act gives the contractor the right to "inter-

est on the amount due and unpaid from time to time on any termination claim under a prime contract that the rate of 2½ per centum per annum for the period beginning thirty days after the date fixed for termination and ending with the date of final payment."

Interest on the payments in this case would not commence to run 30 days after the termination of the contract since they were not due and the contractor had not yet paid them at that time. The payments fell due at the end of each calendar quarter in the years subsequent to the termination of the contract and were paid by plaintiff as they became due. Therefore, interest will begin to run on each of the quarterly payments which together comprise the sum total of the claim in suit, $420,212.46, on the date of payment and will continue to run until actually paid.

Accordingly, judgment will be entered for plaintiff in the amount of $420,212.46, plus interest at the rate of 2½ percent per annum to run from the date of payment by plaintiff of each of the individual payments which went to make up that sum and interest will continue to run until paid.

It is so ordered.

MADDEN and LITTLETON, Judges, concur.

WHITAKER, Judge (dissenting in part).

The original contract called for production of classified materials during a period of 11 months beginning February 1, 1944. Under the authority granted the contracting officer by article XXXIV of the contract, the scope of the contract was extended from time to time to call for a total of 8,796,000 units, and the time for its performance was extended to February 28, 1946.

But, before February 28, 1946, the contract was changed again, this time, on December 29, 1945, so as to cease production of further units, and to put the plant in standby condition, so that production of further units could be re-

sumed when desired. This requirement to put the plant in standby condition was a new requirement, not theretofore incorporated in the contract.

Then, on February 6, 1946, a little over a month later, the contract was again changed to provide for the completion of certain listed operations, and the contract period was extended to May 31, 1946. This was three months later than its prior completion date of February 28, 1946.

All of the changes were agreed to in writing by plaintiff.

The amended contract was completed according to its terms and full settlement was made, except for the costs now in suit.

There was, therefore, no termination of the contract. As changed, it was completed.

It had been extended four times to increase the number of units to be produced and to extend the time for its performance. In reducing the number of units to be produced, the contracting officer was acting pursuant to the same contractual authority he had exercised when he increased the number to be produced. He was exercising the same authority when he directed the contractor to put the plant in standby condition. And he was exercising the same authority when he extended the term of the contract to a date beyond the last previous expiration date, to permit completion of certain listed operations.

This is not a case where a contract was unexpectedly terminated in the midst of its performance, thus disrupting the plans of the contractor and leaving it with materials and equipment on hand for which it had no further use. It was a change made in the work to be performed, which required, not a shortening of the contract time, but an extension of it.

In my opinion, it does not come within the terms of the termination provisions of the Contract Settlement Act, supra, but, rather, under the "changes" article of the contract, as recognized by the con-

tractor's agreement to all the changes made.

For the reasons stated, I do not think the contractor is entitled to interest; otherwise I concur.

JONES, Chief Judge, concurs on foregoing dissent.