**GENERAL BRONZE CORPORATION**
v.
**The UNITED STATES.**
**No. 198-61.**

United States Court of Claims.
Nov. 13, 1964.

David V. Anthony, Washington, D. C., for plaintiff. Gilbert A. Cuneo, Washington, D. C., Joseph Sachter, New York City, Eldon H. Crowell and Sellers, Conner & Cuneo, Washington, D. C., of counsel.

Edward L. Metzler, Washington, D. C., with whom was John W. Douglas, Asst. Atty. Gen., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM.

This contract case, submitted without argument after a Commissioner's recommended opinion, involves both procedural and substantive issues. We treat the former in Part I and the latter in Part II.

I

Plaintiff agreed to rely for its factual proof on the administrative record of the proceedings before the Appeals Board for the Department of Commerce which was admitted into evidence. The defendant then moved, under former Rule 49(c) (now Rule 67(c)), for dismissal on the ground that, on the facts and the law, the plaintiff had not shown a right to recover. Due to the pendency of a counterclaim, Trial Commissioner Fletcher treated the motion, under Rule 49(c), as a motion for judgment by the court that the plaintiff was not entitled as a matter of law to recover. In a report filed on September 19, 1963, Commissioner Fletcher included an opinion, findings of fact, and a recommended conclusion of law that plaintiff is not entitled to recover. Exceptions and briefs have been filed by the parties, and the case has been submitted without oral argument.

The Commissioner did not direct the parties to file requested findings of fact because he believed "that the facts relating to the issues as posed by the plaintiff are essentially uncontroverted, and that accordingly the time-consuming process of preparing and filing of requested findings may properly be omitted without prejudice to the position taken by either party." In its brief to the court plaintiff objects that Rule 49(c) required that it be accorded the right to file requested findings of fact pertinent to the issues raised by the defendant's motion. Although the Commissioner may have erred in believing that the facts were uncontroverted, we believe that the case need not be delayed for the presentation of such requested findings. Plaintiff has informed the court, in detail, of its position on the findings made by the Commissioner (in his formal findings and in his opinion) and of its view of the facts. We have taken account of those exceptions and objections (as well as the defendant's) in making our findings and in rendering our opinion on the merits of the claim. Since plaintiff has thus had adequate opportunity to present its position to the court, there has been no material prejudice from the Commissioner's inadvertent failure to permit the parties to file requested findings. To remand for such a procedure would serve no end but to delay disposition of the case.

Another procedural issue requires mention before we reach the merits. In the proceedings before the

Commissioner the administrative record before the Appeals Board for the Department of Commerce was admitted into evidence for the purpose of determining whether the Board's decision was arbitrary, capricious, not supported by substantial evidence, or erroneous as a matter of law. The court now determines the case on that same basis. The court's underlying findings of fact, insofar as they relate to the merits of the claim, are based either on facts found, explicitly or implicitly, by the Board which are supported by substantial evidence in the administrative record, or on facts conclusively shown by the administrative proceedings or admitted by the pleadings. Where there is room for legitimate disagreement, the court has not made its own independent findings on the basis of the administrative record. Plaintiff did not ask the Commissioner, nor does it ask the court, for anything more than a review of the Board's findings, and it is not entitled to more.[1]

## II

The opinion of the court on the merits of the claim follows. Our discussion is largely based on the Trial Commissioner's opinion but we have modified it in several respects.

On June 28, 1957, plaintiff, as low bidder, was awarded a contract with defendant for the construction of three paraboloidal antenna systems at a total contract price of $408,140. The contract required plaintiff to furnish such antenna systems complete with all necessary parts, hardware, accessories, feed systems, drawings, instructions on assembly, and "in short, everything necessary to enable National Bureau of Standards personnel to assemble and place the antenna system in operation." The paraboloidal reflectors specified were to be made of aluminum alloy with a diameter of 60 feet and a focal length of 25 feet.

At the time this contract was awarded, antenna systems of such size and specifi-

cation had never been produced, and, according to the contracting officer, the National Bureau of Standards (NBS) fully realized that in the then state of the art, the Government's specifications could not be fully definitive in every detail. However, general specifications were set forth in the contract, the following of which are involved in the dispute here:

> "The surface of the reflector shall be expanded or punched aluminum alloy having openings no larger than 0.25 inches in any dimension.

> "After assembly, the deviation of this parabola from a perfect parabolic surface shall be no greater than $\pm \frac{1}{4}$ inch at any point on its surface.

> "The supporting structure reflector and feed system shall be designed to allow the antenna to operate at full precision in winds of 30 mph and at reduced precision with winds of 50 mph.

> "The elevation drive assembly shall be mounted on a platform on the ring gear of the azimuth drive assembly. This drive shall consist of either a single or double ball screw mounted on trunnions, and shall be driven by a servo motor connected by means of a chain and sprocket or gear train."

In addition to the dispute over the foregoing specifications, the parties disagree in their interpretation of the contract requirements regarding operating frequency minimums.

During its performance of the contract, plaintiff experienced some difficulties, most of which appear to have been attributable to a Teamsters' strike and to delay by a subcontractor in furnishing certain required material. During the course of its performance, plaintiff asked the contracting officer in writing for permission to deviate from the specifications in some respects, which requests were granted with one exception. Although the contract required final delivery by

---

1. Plaintiff's brief to the court admits that in view of United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), "plaintiff is now probably required to rely upon the Board record."

April 28, 1958, plaintiff did not actually complete its delivery until August 11, 1958. Shortly thereafter, NBS notified plaintiff of its intention to assess liquidated damages against plaintiff for the 106 calendar days' delay.

Thereupon, on September 24, 1958, plaintiff wrote the Secretary of Commerce via the contracting officer that it desired to appeal any imposition of liquidated damages because it believed such delays as had occurred were excusable. In that letter plaintiff also advised of its intention "to pursue our claim for the additional compensation to which we believe ourselves entitled." This was the first time that the contracting officer was aware of any intention by plaintiff to claim any amounts beyond the contract price. By letter dated November 3, 1958, plaintiff elaborated further upon its claim for additional compensation, and asserted that, with the concurrence of NBS engineers, it had exceeded the contract specifications.

Thereafter, personal conferences were held between representatives of plaintiff and defendant at the offices of NBS in Boulder, Colorado. On January 5, 1959, plaintiff wrote the contracting officer a letter setting forth certain alleged changes, extras, and modifications which plaintiff believed should entitle it to an equitable adjustment of the contract price. That letter did not propose, however, any dollar amounts claimed by plaintiff.

The contracting officer responded to plaintiff's letter of January 5, 1959, by a letter of January 16th reproduced, in pertinent part, in finding 11. After paying high tribute to plaintiff's work under the contract, he stated:

"I realize that to have produced so superior a product your company has

undoubtedly incurred a substantial loss. Had I any discretion in this matter I should be pleased to see you receive additional compensation. The fact remains, however, that only the contracting officer could approve any extras and these, under the terms of the contract, had to be approved in writing. I not only did not approve any extras but was actually never requested to do so and was completely unaware until recently that your company had in any respect exceeded the minimum requirements of our specifications. Under the circumstances, although I should like to see you compensated for the extra costs incurred, I completely lack any authority to approve such compensation."

He suggested that plaintiff "appeal" to the Comptroller General and invited a conference with plaintiff's engineers to work out "a list of those points where we are in agreement that you have actually exceeded the specifications." Apparently such a conference took place shortly thereafter following which the contracting officer wrote plaintiff his letter of January 28, 1959, as set forth at length in finding 12. In that letter he listed five instances as to which "we are in agreement that you have clearly exceeded the specifications * * *."

Armed with this correspondence, plaintiff appealed to the Comptroller General who, on May 29, 1959, issued his decision No. B–138987. In that decision the Comptroller General disagreed with the contracting officer's assertion that he lacked authority to approve additional compensation. The decision pointed out that the contract contained standard provisions as to "changes" [2] and "extras".[3] By reason of there being no time limit in these standard provisions, and in view of

---

2. "The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Govern-

ment in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjust-

3. See Note 3 on Page 121.

the fact that final payment under the contract had not yet been made, the Comptroller General held that the contracting officer did have authority to issue orders for both changes and extras, and accordingly, he returned the case to NBS "for disposition by the contracting officer."

By letter dated June 25, 1959, the contracting officer advised plaintiff, in effect, that he had erred in his prior statements of January 28, 1959, to the effect that in five respects plaintiff had exceeded the specifications. He, therefore, refused to award a change order for extra compensation on any of those five items. He said, however, that he would be willing, on a proper showing, (1) to issue a change order for a substitute made by plaintiff on the feed support ring and (2) to adjust the matter of liquidated damages.

Plaintiff's appeal from that decision to the Secretary of Commerce was referred to the Appeals Board for the Department of Commerce. After a hearing at which testimony and documentary exhibits were received, the Board issued a decision denying plaintiff's appeal, without prejudice, however, to an equitable adjustment for the feed support ring and relief from liquidated damages. Thereafter, following an audit by defendant of plaintiff's costs in supplying a different type of feed support ring, defendant paid an additional sum to plaintiff in the amount of $22,592. Also, the liquidated damages assessment against plaintiff was canceled.

The text of the Board's decision is reproduced in its entirety as the Appendix to Defendant's Answer and Counterclaim herein and will not be reproduced here. Suffice it to say, by way of summary, that the Board gave full consideration to the contracting officer's letters of January 16 and 28, 1959, and disagreed with plaintiff's contention that the letter of January 28, 1959, constituted a binding agreement which the contracting officer could not unilaterally repudiate. Since the contract had been fully performed by plaintiff long prior to the time those letters were written, the Board found that plaintiff had not altered its contract performance in reliance on anything said therein. In addition to that finding, the Board gave its consideration to each of the five points contained in the letter of January 28, 1959, and concluded that in none of them had plaintiff actually exceeded the contract specifications. The contracting officer's statements to the contrary in that letter were simply attributable, so the Board thought, to his failure to quote the specifications accurately.

Insofar as the decision of the Appeals Board involved factual issues within the Disputes clause, the Board's findings are indubitably supported by substantial evidence and cannot be overturned. Insofar as in its interpretation of the contract specifications the Board was dealing with questions of law, it reached proper and reasonable results which commend themselves to this court. The plaintiff does not now contend that the Board misinterpreted the specifications; in fact, the plaintiff's briefs contain no argument on that point.

Plaintiff's presentation to this court takes a different tack. Throughout pre-

---

ment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the contractor of the notification of change: *Provided, however*, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to

agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled 'Disputes.' However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed."

3. "Except as otherwise provided in this contract, no payment for extras shall be made unless such extras and the price therefor have been authorized in writing by the Contracting Officer."

trial proceedings and in its briefs, plaintiff has constantly reiterated its basic reliance upon the contracting officer's letter of January 28, 1959. Plaintiff considers that letter to be a supplemental compromise agreement by defendant which recognized liability leaving open only the amount of plaintiff's recovery and which could not be unilaterally repudiated. To use plaintiff's words in its response to defendant's motion:

"The case is basically a very simple case. Plaintiff alleges an agreement with the Contracting Officer whereby the Contracting Officer agreed to pay certain amounts to the plaintiff but for the fact that he did not believe he had such authority. The matter was then referred to the General Accounting Office. The Comptroller General stated that the Contracting Officer did have such authority. When the matter was finally referred back to the Contracting Officer for his action, he had changed his mind and decided that he would not make any payment in accordance with his previous agreement."

■■ To accept plaintiff's position, however, would be to pass by the hornbook rule that, even if it were possible to consider the January 28th letter as a new and supplementary agreement, before it could be a legally binding contract there must have been an independent and present consideration to support it. If this was a new and supplementary agreement, past consideration would not be sufficient. In the succinct words of Professor Williston:

"* * * Consideration, by its very definition, must be given in exchange for the promise, or at least in reliance upon the promise. Accordingly, something which has been given before the promise was made and, therefore, without reference to it, cannot, properly speaking, be legal consideration. * * *

* * * * * *

"* * * The doctrine that past consideration is no consideration represents the overwhelming weight of authority and is almost universally followed. This has been the law since early times." 1 Williston on Contracts Sec. 142 (3d ed. 1957).

This court's agreement with that well-recognized rule of contract law is reflected in its decision in Houdaille Industries, Inc. v. United States, 151 F. Supp. 298, 308, 138 Ct.Cl. 301, 317 (1957).

Here the Appeals Board has found that, since performance of the contract had already been completed, plaintiff did not alter its performance in reliance on anything said by the contracting officer in the letter on which plaintiff relies. That finding, as we have said, is fully supported by the administrative record and is final and conclusive. See the Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§ 321–322, and United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

In recognition of the fact that, to prevail here on the theory of a new and supplementary agreement, it must in some way show a *quid pro quo* for the alleged January 28th separate agreement by the contracting officer, plaintiff has developed a theory of what might be called vicarious consideration. It said *to the Comptroller General* that "in the interest of full agreement" it was willing to give up other possible claims under the contract and accept the contracting officer's description of five instances where he considered that plaintiff had exceeded the contract specifications. However, it is implicit in the Appeal Board's decision that the *contracting officer* was not induced to say what he did on January 28th by any undertaking or promise on plaintiff's part to waive its other contract claims, mythical or real. That conclusion is sustained by the evidence before the Board which fails to support plaintiff's contention that any such *quid pro quo* was offered or accept-

‹ed.[4] The letter of January 28th did not reflect a compromise or a new agreement, but simply the contracting officer's unilateral feeling at that time.

Although, as stated, plaintiff's primary theory of liability appears to be based on its contention that the contracting officer's letter of January 28th, standing alone, constituted a new and binding agreement, it also seems to rely for the required consideration on a contention that, *prior to performance*, NBS engineers had concurred in plaintiff's proposed changes and extras. As proof of this, plaintiff points to a letter from the Assistant Secretary of Commerce to the General Accounting Office in which it is stated that "the five changes listed in the Contracting Officer's letter of January 28, 1959 * * * were concurred in by the Government engineers prior to performance by the Contractor." See finding 13.

█ As previously stated, the Appeals Board in its comparison of the so-called "five changes" against the actual specifications could find no instance wherein plaintiff had exceeded the specifications as written. But, even if it be assumed that, during performance, "five changes" occurred in which NBS engineers "concurred," plaintiff remains confronted with an insuperable difficulty. At no time did the contracting officer by written order make the five alleged changes in the contract or authorize in writing any extras thereunder.[5] Thus, the plaintiff is unable to bring itself within the clear requirements of the "changes" and "extras" clauses of the contract which require any changes or extras to be ordered *in writing* by the contracting officer. That plaintiff was aware of this contractual requirement is evidenced by the fact that in October and November 1957, it requested and received *in writing* permission to deviate from the speci-

fications as to requirements not here involved. See finding 4.

Long ago, the United States Supreme Court held that a failure to obtain from the department head a *written* approval for changes or extras is fatal to a contractor's recovery under a Government contract. Plumley v. United States, 226 U.S. 545, 33 S.Ct. 139, 57 L.Ed. 342 (1913). The Court said at 226 U.S. 547, 33 S.Ct. 140:

"The other items for extra work were properly disallowed. The contract provided that changes increasing or diminishing the cost must be agreed on in writing by the contractor and the architect, with a statement of the price of the substituted material and work. * * * In every instance it was necessary that the change should be approved by the Secretary. There was a total failure to comply with these provisions, and though it may be a hard case, since the court found that the work was in fact extra and of considerable value, yet Plumley cannot recover for that which, though extra, was not orderd by the officer and *in the manner required by the contract.*" [Emphasis supplied.]

The Court of Claims has also considered "another case where the defendant has received the benefit of work done by the contractor on the order of defendant's representatives in charge of the work, but refuses to pay for it because the contract requirements were not complied with." Globe Indemnity Co. v. United States, 102 Ct.Cl. 21, 35 (1944), cert. denied, 324 U.S. 852, 65 S.Ct. 712, 89 L.Ed. 1412 (1945). Because the additional work did not have the written approval of the department head, as required by the contract, this court held, albeit reluctantly, that the contractor

---

4. The testimony of its Director of Research and Development, on which plaintiff relies heavily, is so unclear, so general, and so equivocal that it cannot support the claim that a compromise was offered or consummated.

5. There can be no factual dispute regarding this statement, although presumably plaintiff would contend as a matter of law that the contracting officer's letter of January 28th itself constituted the required written change order or authorization. This matter is discussed below.

could not recover, saying at 102 Ct.Cl. 38:

> "* * * contractors must study their contracts and insist on compliance with their terms; before relying on any promise they should ascertain that it is made by a person having authority to make it."

On its facts, the present case is an even stronger one for defendant, for it must be remembered that here the contracting officer has steadfastly denied that he had any prior knowledge of the alleged five changes, much less did he order them orally or in writing. See, for example, his letter to plaintiff dated January 16, 1959, quoted in finding 11. The record does not indicate that plaintiff ever disputed that assertion other than to contend that the "concurrence" of NBS engineers constituted constructive notice to the contracting officer. Hence, this case is not like W. H. Armstrong & Co. v. United States, 98 Ct.Cl. 519 (1943). There, in the interest of a just result, a divided court permitted recovery where the contracting officer himself had ordered the extras and promised an adjustment, even though orally.

That, in a claim for extra costs, the contractor must show some action on the part of the contracting officer (or his authorized representative),[6] as distinguished from subordinates, is demonstrated by this court's decision in The Woodcraft Corporation v. United States, 173 F.Supp. 613, 146 Ct.Cl. 101 (1959). There the plaintiff sought additional compensation for extra costs incurred in manufacturing camp tables for the Army. Plaintiff contended that its added expense resulted from its compliance with erroneous instructions from a Government inspector, which error had not been corrected until a successor inspector was assigned to the contract. In dismissing the plaintiff's petition, the court said at 173 F.Supp. 614, 146 Ct.Cl. 103:

> "For our decision, we may accept the plaintiff's assertion of ambigu-

ity in both of the pertinent specifications. We may likewise grant that the new work was actually not within the contract and, also arguendo, that the first inspector's directions caused the excess investment now claimed by the plaintiff. But still the loss would be unrecoverable. The reason is that in these disbursements the plaintiff was a volunteer.

> \* \* \* \* \* \*

> "As the plaintiff must admit, the additional costs were *ultra contractum*. Therefore, to win their recovery some extrinsic promise, implied or express, must be shown, such as an involuntary and compelled compliance, an allowed extra or a change in the contract. But an expenditure could not be involuntary and compelled without a previous protest to the contracting officer; J. A. Ross & Company v. United States, 1953, 115 F.Supp. 187, 126 Ct.Cl. 323, 329; and under the contract he alone could bind the defendant to an extra or a change. Thus, the plaintiff having acceded without objection to the inspector's demands, and now unable to plead either an ordered extra or an authorized change, the plaintiff's claim is without legal predicate."

If the Government is to be held strictly to its contractual obligations as though it were a private obligor, then, of course, it is entitled to insist that those who contract with it shall be held to the same accountability. Rolin v. United States, 142 Ct.Cl. 73, 160 F.Supp. 264 (1958). If one can imagine the parties here in reversed positions, it is inconceivable that plaintiff would not insist—and rightly so—upon its freedom from a decrease in the contract price because of some change which was not specified, as the contract requires, "by written order." The mere fact that the defendant is also a sovereign should not prejudice it in asking that its contractual rights be honored.

6. There is no showing at all that the engineers here were authorized representatives of the contracting officer for the purpose of ordering changes.

There remains to be considered whether the contracting officer's letter of January 28, 1959, can itself be deemed a change order or an authorization for extras at a stated price by the contracting officer. If the letter, fairly read, could be considered to be either, then the fact that it was written after completion of the contract performance would not preclude plaintiff because, as the Comptroller General held, final payment had not yet been made and the changes and extras clauses do not contain a time limit. However, reading language in its ordinary sense, it cannot be said that the letter took the usual form of an order for changes or an authorization for "extras and the price therefor." It simply stated (erroneously, in the Board's view of the specifications) that plaintiff had "clearly exceeded the specifications" in five respects. This is a far cry from ordering plaintiff to exceed the specifications and from authorizing payment of a stated price for extras.

Because of the "technical nature" of the contract, the Comptroller General was uncertain as to what the letter did mean. After correcting the erroneous view of the contracting officer that he had no authority to issue an order for changes and extras, the Comptroller General simply returned the matter "for disposition by the contracting officer." When thus required by higher authority to make a decision in the matter, the contracting officer by his letter to plaintiff dated June 25, 1959, specifically refused to issue a change order or authorize payment for extras (except in a single instance not now involved). See finding 15. Here was meaningful action by the contracting officer within the provisions of the "changes" and "extras" clauses. Prior to that time, he had done nothing more than agree that plaintiff had exceeded the specifications while at the same time denying that he had ordered or authorized it to do so. As we have indicated, if one views his January 1959 correspondence in context, it appears reasonably obvious that the contracting officer was highly pleased with what he considered to be an excellent performance and which he believed in some respects went beyond the contract requirements. Equally obvious, however, is his belief that in so doing plaintiff acted simply as a volunteer whose only source of relief might be the Comptroller General. This is not the action of a contracting officer engaged in the issuance of a written change order. And insofar as plaintiff argues that the contracting officer *should* have issued a change order, the contention fails, as we have already held, because there were no actual changes in the contract specifications or requirements.

For the foregoing reasons, it is the opinion of the court that plaintiff has failed to make a *prima facie* case and that, accordingly, as a matter of law, plaintiff is not entitled to recover. The counterclaim is not now before the court and will have to be considered separately under proper proceedings.